[No. B017718. Second Dist., Div. Three. Mar. 27, 1986.]

JACK OSCAR LEO, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Harry W. Brainard and Curt V. Leftwich for Petitioner.

No appearance for Respondent.

Ira Reiner, District Attorney, Donald J. Kaplan and Brent Riggs, Deputy District Attorneys for Real Party in Interest.

**OPINION**

**ARABIAN, J.—**

### INTRODUCTION

■■ ■■■■ This case presents a question of first impression. Petitioner Jack Oscar Leo, who is charged with a capital offense, seeks a writ of mandate directing respondent superior court to vacate its ruling allowing the People, the real party in interest, to revise its initial decision not to seek the death penalty and to instead pursue the death penalty against petitioner.[1] The People having shown cause before this court why such writ should not issue, the alternative writ is discharged and the peremptory writ is denied.

### FACTS

On August 7, 1984, following a preliminary hearing, an information was filed in respondent court charging petitioner with the robberies of Robert J.

---

[1]This is only the second time the Los Angeles District Attorney has reversed its position and decided to seek the death penalty after initially determining it would not do so. In the other such case, People v. Randy Lee Howard (Super. Ct. L.A. Co., No. A-384358), the defendant (on May 13, 1985) successfully moved in the superior court for an order prohibiting the People from pursuing the death penalty. We have only a sketchy report from the parties as to the superior court's reasons for its holding. In any event, the Howard decision is not of any precedential value for this court.

Mallory, Laura J. Mallory, and Kathy Rhea (Pen. Code, § 211) and the murder of Robert J. Mallory (Pen. Code, § 187) on February 27, 1984, at the Plaza West Pharmacy.[2] It was further alleged that in the commission of the murder, petitioner had personally used a firearm, to wit, a sawed-off shotgun, within the meaning of Penal Code sections 12022.5 and 1203.06, subdivision (a)(1); and that the murder was committed during the commission of a robbery within the meaning of Penal Code section 190.2, subdivision (a)(17).

It was also alleged, in an amendment to the information, that petitioner was convicted of three serious felonies in California, to wit, burglary (Pen. Code, §§ 459, 667, subd. (a)), on January 20, 1976; burglary (Pen. Code, §§ 459, 667, subd. (a)), on February 17, 1975; armed robbery (Pen. Code, §§ 459, 667, subd. (a), 1203.06, subd. (a)(2)), on April 23, 1981; and was convicted of seven felonies in Pennsylvania (the equivalent California statutes are noted), to wit, three counts of possession and sale of narcotics (Health & Saf. Code, §§ 11350, 11352) on December 15, 1971; possession of narcotics and conspiracy (Health & Saf. Code, § 11350, Pen. Code, § 182), on December 15, 1971; burglary, larceny and receiving stolen property (Pen. Code, §§ 459, 487, 496), on December 15, 1971; possession of narcotics and possession of dangerous drugs (Health & Saf. Code, § 11350), on January 26, 1971; assault with intent to kill and aggravated assault and battery (Pen. Code, §§ 664/187, 245, 1203, subd. (e)(4)), on April 28, 1970.

Two-and-one-half months after the information was filed, by letter dated October 22, 1984, Mr. Curt Livesay, the special circumstances designee[3] for the district attorney, notified petitioner's counsel that the district attorney had decided the death penalty was not warranted in petitioner's case. Accordingly, Mr. Livesay invited petitioner, with consent of his counsel, to waive the penalty trial in the event petitioner should be found guilty of first degree murder and any special circumstances alleged in the information be found true. The letter explained that, since the death penalty would not be sought by the district attorney, it was "not necessary for a penalty trial to be held at which evidence pertaining to aggravation, mitigation and sentence would be introduced."

---

[2] The information also charged petitioner with three robberies (Pen. Code, § 211) at the Plaza West Pharmacy on January 18, 1984, and alleged that in the commission of the robberies, petitioner had been armed with a deadly weapon, to wit, a sawed-off shotgun, within the meaning of Penal Code section 12022, subdivision (a), and that he had personally used a firearm, to wit, a sawed-off shotgun, within the meaning of Penal Code sections 12022.5 and 1203.06, subdivision (a)(1).

[3] The special circumstances designee is a deputy designated by the chief deputy district attorney.

Enclosed with Mr. Livesay's letter was a "waiver and agreement" form. Petitioner and his counsel executed the form, acknowledging, *inter alia,* the murder and special circumstances charges, waiving any right to which petitioner was entitled to a trial by court or jury as to whether petitioner would be punished by death or life imprisonment without possibility of parole, and agreeing that, should petitioner be found guilty of first degree murder and any charged special circumstances be found true, respondent court, if the court accepted the agreement, would sentence petitioner without a penalty trial being held.

Mr. Curt Livesay, who signed the October 22, 1984, letter, was the person assigned to make the decision whether to seek the death penalty in the last 800 to 825 cases in which such decision was required.

In this decisionmaking process, guidelines issued by the district attorney, and contained in a legal policies manual, are utilized. In accordance with these guidelines, when Mr. Livesay makes the decision whether to pursue the death penalty, he is in possession of a special circumstance/penalty evaluation memorandum (evaluation memorandum), initiated by the head deputy district attorney. In this evaluation memorandum, the case is analyzed and a recommendation regarding the appropriate sentence is made. The evaluation memorandum is prepared after the preliminary hearing, when a defendant has been held to answer on a charge of murder with special circumstances.

*Initial evaluation memorandum of September 21, 1984.*

Mr. Livesay is not required to accept the head deputy's recommendation in the evaluation memorandum. In fact, in this case, Mr. Livesay initially did not follow the recommendation of the head deputy, Michael Genelin. In his September 21, 1984, evaluation memorandum to Mr. Livesay, Mr. Genelin had recommended the death penalty as the appropriate punishment for petitioner, describing the circumstances of the murder as follows:

"On February 27, 1984, . . . [t]wo suspects entered [Plaza West Pharmacy] at approximately 3:50 p.m. [Petitioner] with a sawed-off shotgun entered through the west door and [Dawn Elyne Ayres] with a small handgun entered through the south door. The persons working at the store at the time were the deceased Robert Mallory, his daughter Laura Mallory, Kathy Rhea, Barbara Sivadge and Vicky Lynn Briggs. [Petitioner] stated, 'This is a robbery, put the drugs in the bags.' He thereupon threw bags on the floor behind the pharmacy. Victim Laura Mallory picked up one of the bags and complied with [petitioner's] demands. . . . [Petitioner] thereupon entered the office stating, 'Where's the rest of the money,' and took the money from

bank deposit bags which were in the office. He then ordered victim Laura Mallory to open the change drawer and get the change for him, which she did. Additional drugs were also taken. [Ayres] ordered Kathy Rhea to the front register and forced her to open the register and place the money from that register into a bag. . . . The victims Kathy Rhea, Vicky Briggs and Barbara Sivadge were then ordered to the restroom. Victim Robert Mallory attempted to answer a phone that was ringing, but the receiver was slammed down by [Ayres] who pointed her weapon at his legs and pulled the trigger. The weapon made a clicking sound, but did not fire. [Ayres] thereupon stated 'The next one's for real.' When Robert Mallory did not move as ordered towards the restroom, she fired a shot which traveled through his inside pant leg.

"[Petitioner] then ordered victim Robert Mallory to the restroom threatening to kill the victim Robert Mallory if he did not so move. [Petitioner] stated, 'I have already got one murder on my head, and I don't want to make it two. Get out of my sight and go to the bathroom.' The deceased Robert Mallory walked back to the area of the bathroom and out of the sight of his daughter Laura Mallory. Ms. Mallory was then ordered by [Petitioner] to continue placing drugs into the bags. Within a minute, Laura Mallory observed her father, Robert Mallory, come from the restroom area out into the store and walk towards the cash register in the front of the store. The deceased grabbed [Ayres] from behind, placing his right arm around her chest and shoulder area in what appeared to be an attempt to control [her]. The deceased thereupon stated to [petitioner]. 'Come and get me,' and at the time, struggled with [Ayres]. [Petitioner] who was with Laura Mallory in the pharmacy area, ran to where the deceased and [Ayres] were struggling. As [petitioner] arrived, [Ayres] broke free. [Petitioner] shot Robert Mallory in the chest with the shotgun. The deceased immediately fell to the floor and the two suspects fled the scene."

In that part of the September 21, 1984, evaluation memorandum in which Mr. Genelin analyzed the appropriateness of making special circumstances allegations regarding petitioner's crimes, he noted: "During the commission of all three robberies, [petitioner] was armed with a sawed-off shotgun. On each occasion, he pointed the weapon at the victims with the implied threat to kill if the victims did not respond to his demands for drugs and money. During the robbery/murder he had threatened to kill the victim, stating to the victim 'I have already got one murder on my head and I don't want to make it two. Get out of my sight and go to the bathroom.' In the robbery/ murder, the defendant killed the victim by firing a shotgun point blank at the victim's chest. The victim was unarmed and offered no resistance at the time of the killing. However, moments before the killing, the victim had run up behind [petitioner's] crime partner and grabbed [her] from behind.

The victim then shouted to [petitioner] to 'Come and get me.' The victim appeared to be attempting to rescue his daughter victim Laura Mallory, who was being held by [petitioner] in the pharmacy area."

*Mr. Knight's first memorandum dated December 5, 1984.*

Subsequent to Mr. Livesay's review of this evaluation memorandum and his letter to petitioner advising him that the People would not seek the death penalty, the district attorney's office, in December of 1984, came into possession of additional information which aggravated the nature of the alleged murder. Laura Mallory, the daughter of the deceased, an eyewitness to the crime, informed the trial deputy, Michael Knight, that at the time petitioner shot her father to death, he had been backing away from petitioner with his hands raised in surrender. This was information which Laura had not previously given to the police, nor to anyone else, until two days after the preliminary hearing, when she told her brother.

Accordingly, on December 5, 1984, Mr. Knight, the trial deputy, wrote a memorandum to Mr. Livesay, informing him that in preparing the matter for trial, he interviewed Laura "regarding the acts at the time her father was shot by [petitioner]." Mr. Knight noted in the memorandum:

"[Laura Mallory] indicated that at the time her father grabbed suspect Ayres from behind and yelled to [petitioner] to 'Come and get' (him) that it appeared the deceased was merely trying to restrain Ayres. She further indicated that [petitioner] immediately ran to the area where her father was standing and arrived within a few seconds. She observed her father standing in the aisle and noted that he had put his hands up parallel to his shoulders and that he, in fact, was unarmed. She then observed [petitioner] pointing the weapon at her father and observed that her father appeared to be shying back away from [petitioner]. The witness indicated that her father had his hands in the air for approximately one-half second, whereupon [petitioner] fired the weapon knocking her father back between the two gondolas and onto the floor. She thereafter did not see . . . [petitioner] or how [he] left the premises. She did note that at the time [petitioner] left the pharmacy area to where her father was standing, that he was not carrying the bag of drugs which she was filling for him in the pharmacy. It appears that [petitioner] left the area where the shooting took place, returned to the pharmacy, picked up the bag of drugs and left the store by way of [the] Corbin Street door. The witness further indicated that the struggle between Ayres and her father ended sometime before [petitioner] arrived at the location where the shooting took place and that Ayres at that time was not within her sight. The entire sequence of events from the time her father grabbed

Ayres until the fatal shot was fired took approximately three to four seconds."

*Mr. Knight's second memorandum dated December 28, 1984.*

On December 28, 1984, Mr. Knight wrote a second memorandum to Mr. Livesay, reiterating the facts in his December 5, 1984, memorandum and adding:

"Laura Mallory stated [petitioner] ran from the pharmacy area to the location of her father and Dawn Ayres—a distance of 75 feet. Upon reaching the area where the deceased was standing, [petitioner] stopped, pointed the shotgun at her father, moved toward her father and then shot her father. She was approximately fifteen feet from her father and could see that her father was moving back away from [petitioner], hands raised and open toward [petitioner].

"In light of the information received from Laura Mallory that her father was in fact standing with his hands raised, and that he was unarmed and actually shying back away from [petitioner] at the time of the shooting, it appears that this intentional act warrants that we seek the death penalty. The other facts remain unchanged and they also support the death penalty as the appropriate punishment."

In reevaluating this case in light of the new information contained in Mr. Knight's memoranda of December 5 and 28, 1984, Mr. Livesay, for the district attorney, decided the death penalty should be pursued against petitioner. Accordingly, the defense was officially informed of the district attorney's new determination on February 1, 1985.

Six months later, on September 4, 1985, the defense filed a motion to prohibit the People from seeking the death penalty against petitioner. On November 14, 1985, following a hearing on the motion, respondent court ruled that the People should not be prohibited from seeking the death penalty, even though they had initially decided not to do so. This petition followed.

## CONTENTIONS

I. A specifically enforceable contract was entered between petitioner and the district attorney when petitioner and his counsel executed the penalty trial "waiver and agreement" form.

II. The imposition and execution of the death penalty, based upon an arbitrary decision of the People, constitutes cruel and/or unusual punish-

ment within the meaning of the Eighth Amendment to the United States Constitution and article I, section 6, of the California Constitution.

a. The district attorney's decision to seek the death penalty as to petitioner "was random, arbitrary and capricious because: (1) [t]here was no change of circumstance after the decision not to seek the death penalty was made, and (2) [the District Attorney] should have been aware of the 'new evidence' at the time the decision not to seek the death penalty was made."

b. The district attorney's decision to seek the death penalty was unconstitutionally applied in a manner disproportionate to petitioner's crime.

III. The People should be estopped from seeking the death penalty against petitioner.

DISCUSSION

I.

*No enforceable contract or bargain was reached between petitioner and the district attorney which precludes the People from now seeking the death penalty.*

██ Petitioner contends a "bargain" was reached between himself and the district attorney which precludes the People from now seeking the death penalty. In support of his position, petitioner analogizes his agreement with the People to waive the penalty phase of the trial to a plea bargain and urges that principles of civil contract law required the trial court to specifically enforce his bargain. (See *People* v. *Alvarez* (1982) 127 Cal.App.3d 629, 633 [198 Cal.Rptr. 167].) We disagree.

██ Although the terms of a plea bargain agreement may be ascertained with reference to principles of contract law (see *People* v. *Alvarez, supra,* 127 Cal.App.3d at p. 633), plea bargains are specifically enforced by the courts on *due process* grounds (see *People* v. *Mancheno* (1982) 32 Cal.3d 855, 860-861 [187 Cal.Rptr. 441, 654 P.2d 211]).

██ Even if we accept petitioner's flawed plea bargain analogy, "[t]he cases which estop the prosecution from rescinding a plea agreement and require specific enforcement of the bargain are those in which the defendant has suffered some detriment in relying on the agreement. [Citations.] [¶] The crucial factor in determining if the prosecution may withdraw a plea bargain offer or if the offer having once been made and accepted is specifically enforceable by a defendant is whether the defendant has given up a

valuable constitutional right or otherwise detrimentally relied on the promises made in the plea bargain. [Citation.]" (*People* v. *Yu* (1983) 143 Cal.App.3d 358, 371-372 [191 Cal.Rptr. 859], cert. den. 464 U.S. 1072 [79 L.Ed.2d 218, 104 S.Ct. 981].)

■ Here, if petitioner should be found guilty of first degree murder and any special circumstances allegation be found true, he is entitled to the death penalty trial he initially waived when the People advised him they would not seek the death penalty. Further, since the trial has not yet begun, petitioner has adequate time to prepare to defend his case as one for a capital offense. Therefore, petitioner has not given up a valuable constitutional right nor otherwise detrimentally relied on the People's initial agreement not to seek the death penalty. (*People* v. *Yu, supra*, 143 Cal.App.3d at p. 372.)

■ "'Due process of law requires that an accused be advised of the charges against him in order that he may have a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial.' [Citation.]" (*People* v. *West* (1970) 3 Cal.3d 595, 612 [91 Cal.Rptr. 385, 477 P.2d 409]; and see *People* v. *Lohbauer* (1981) 29 Cal.3d 364, 368 [173 Cal.Rptr. 453, 627 P.2d 183].) ■ Here, inasmuch as the People advised the defense at the pretrial stage of this case of their revised determination to pursue the death penalty, petitioner was not thereby denied the due process of law to which he was, and is, entitled.

## II.

### A. *The People's decision to pursue the death penalty was not random, arbitrary or capricious; thus, it did not constitute cruel and/ or unusual punishment under the United States and California Constitutions.*

Petitioner claims the decision of the district attorney to seek the death penalty was "random, arbitrary and capricious because: (1) [t]here was no change of circumstance after the decision not to seek the death penalty was made, and (2) [the District Attorney] should have been aware of the 'new evidence' at the time the decision not to seek the death penalty was made."

■ As to his first premise, petitioner urges the additional facts provided by decedent's daughter "do not constitute a material change in circumstance" because, before the district attorney knew of these facts, the evaluation memorandum, which Mr. Livesay reviewed in making his initial decision whether to seek the death penalty, already contained the conclusion that "this was a cold-hearted, premeditated retaliation murder of an unarmed/defenseless man."

Livesay, however, testified at the hearing on petitioner's motion, that he did not rely on that sentence, which was the conclusion of the head deputy, Mr. Genelin. Rather, he made his initial decision not to seek the death penalty based on that part of the evaluation memorandum which described what happened; namely, that the decedent grabbed Ayres from behind, placing his right arm around her chest and shoulder in an attempt to control her; that the decedent thereupon stated to petitioner, "'Come and get me;'" that petitioner ran through the pharmacy to the area where the decedent and Ayres were struggling; that Ayres broke free and that petitioner then shot the decedent in the chest.

Livesay explained that, in making his initial decision against the death penalty, he considered those facts important because they indicated that an act on the part of the decedent precipitated the shooting and that petitioner shot the decedent during the struggle with Ayres, or at least immediately after Ayres broke free.

Livesay further explained that he thereafter reversed his original decision not to seek the death penalty when he reviewed the memoranda from Mr. Knight, the trial deputy, dated December 5 and December 28, 1984. Those memoranda contained the new information that the deceased was standing with his open hands raised out straight, parallel to his shoulders, when he was shot; that he was shying back away from petitioner; that he was unarmed; that some time elapsed between the deceased's release of Ayres and the shooting; that Ayres no longer needed petitioner's help because the struggle had ended; that petitioner moved 75 feet across the pharmacy, stopped, pointed the shotgun, moved toward the deceased and shot him.

Therefore, there was, in petitioner's own terms, a "material change in the circumstances" known to Mr. Livesay when he revised his opinion and decided to pursue the death penalty. The new facts which Laura recalled are facts in aggravation of petitioner's alleged crime. Since these facts were not considered when Mr. Livesay made his initial decision not to seek the death penalty, it was incumbent upon him to consider those facts when reweighing the circumstances of the murder in order to make a new penalty decision. That revised decision was thus not random, arbitrary or capricious.

■ Equally lacking in merit is petitioner's second point, that the district attorney should have been aware of the "new evidence" when the initial decision not to seek the death penalty was made.

While it is preferable for the People to have all the facts before making death penalty decisions, we refuse to hold that the district attorney is pre-

cluded from considering evidence newly recalled by a witness merely because that witness failed to remember or verbalize certain facts during earlier interviews with the police or the prosecutor, or at the preliminary hearing.

B. *The People's decision to seek the death penalty was not unconstitutionally applied out of proportion to petitioner's crime; thus it does not constitute cruel and/or unusual punishment under the United States and California Constitutions.*

Petitioner brought to the attention of respondent court three prosecutions in which the district attorney did not seek the death penalty. Pointing to the circumstances of these three cases, which he contends are similar to his, petitioner asserts he was the subject of arbitrary treatment by the district attorney. We find no merit in petitioner's contention.

At the hearing, Mr. Livesay testified as to the reasons why he made the decisions in those cases not to seek the death penalty and compared the three cases with petitioner's case. He explained that he makes his determination regarding the death penalty based on factors enumerated in the District Attorney's Legal Policy Manual and in Penal Code section 190.2. The most important factors considered are the circumstances of the murder; also considered are the age of the defendant and his prior record.

In the first case, Mart Meiel, age 34, robbed a market. He approached a checker, placed a dollar on the counter and asked for cigarettes. The checker exclaimed, "'He is robbing me.'" The victim, another checker, started toward Meiel. Meiel pulled out a handgun and from approximately six feet away shot the victim through the heart, killing him.

Meiel had a record of several felonies, including a robbery conviction, usually considered a violent felony. However, Mr. Livesay noted and considered the fact that Meiel was unarmed during that prior robbery.

In Meiel's case, Mr. Livesay gave great weight to the circumstances of the murder. He explained that Meiel's use of a pistol was a less aggravating circumstance than was petitioner's use of a shotgun. The evaluation report indicated that Meiel's victim walked toward him and one witness said the victim had his hands in the air. The circumstances reported in the evaluation report differed from those in petitioner's case, because the victim was not backing away from Meiel.[4] Further, the evaluation report contained a rec-

---

[4] At the hearing, Mr. Livesay was told by defense counsel during questioning that some investigative reports said the victim put up his hands, took a couple of steps back and said "'Don't shoot,'" then was fired upon by Meiel from a distance of four to eight feet away. However, the evaluation report, from which Mr. Livesay made his decision, did not reflect that information. Mr. Livesay said he would have considered those facts had he known of them, but he was not certain they would have changed his decision not to seek the death penalty for Meiel.

ommendation, which Mr. Livesay followed, against seeking the death penalty for Meiel.

In the second case, Clarence Odee Lewis, age 34, was armed with a sawed-off shotgun when he and a companion forcibly entered a residence occupied by two adults. Both men forced the victim into the bathroom with his hands above his head. Lewis kept his shotgun trained on the victim, while his companion searched the victim, took his wallet, and gave part of the contents of the wallet to Lewis. The men started to exit the location, Lewis backing away with his gun pointing at the victim who was exiting the bathroom. When the victim began to drop his hands, Lewis fired once, striking the victim in the chest and killing him.

Lewis had a lengthy history of felony convictions and violence.

Mr. Livesay explained that he made the decision not to seek the death penalty for Lewis based on the fact that the victim was approaching Lewis and dropped his hands toward his belt where he was carrying a knife in a sheath. The recommendation on the evaluation report, which Mr. Livesay followed, was against seeking the death penalty for Lewis.

In the third case, Stephen Allen Grass, age 34, and a companion, assaulted a transient with a knife, making several slash wounds across his throat, which killed him. The transient had flashed a large amount of money earlier in the evening and it was apparently observed by Grass. Grass and his companion were picked up later with blood spots on their clothing. Grass' statement included the information that he " 'went to rob the old guy and the guy fought back.' "

Grass had a record of nonviolent felonies, including ex-felon with a gun and two second degree burglaries.

Mr. Livesay explained that this was a much less sophisticated murder than that committed by petitioner. Further, Mr. Livesay followed the recommendation on the evaluation report against pursuing the death penalty for Grass.

Mr. Livesay noted that petitioner's case differed from, and was more aggravated than, the three cases the defense presented to make its proportionality argument. Petitioner, then age 33, was charged with three separate robberies in the pharmacy, as well as the murder. There was information in the evaluation report that petitioner had threatened to kill the deceased prior to the shooting. The deceased was unarmed, had his hands up and was shying back away from petitioner, before he was shot. Petitioner had a

lengthy prior record involving various acts of violence. Further, unlike the evaluation reports of Meiel, Lewis and Grass, petitioner's original special circumstance/penalty evaluation report contained a recommendation that the People should seek the death penalty. Mr. Livesay, however, did not follow that recommendation as, based on that original evaluation report, he decided not to seek the death penalty. However, Mr. Livesay changed his initial decision after reading Mr. Knight's memoranda of December 5 and 28, 1984. In those memoranda, Mr. Knight urged that the death penalty be sought for petitioner because of the new facts recently recalled by the deceased's daughter Laura.

In *People* v. *Gephart* (1979) 93 Cal.App.3d 989 [156 Cal.Rptr. 489], the Court of Appeal explained, "[t]he public prosecutor is vested with discretion in deciding whether to prosecute. (Gov. Code, § 26501.) This discretion is broad and quasi-judicial in nature. [Citations.] The discretion exercised is broader than 'probable cause' and includes the opinion of guilt, likelihood of conviction, evaluation of legal issues, witness problems, whether the accused is regarded as dangerous, and the alternatives to prosecution." (*Id.*, at pp. 999-1000.)

A decision by the district attorney whether the death penalty should be pursued in a particular case is a proper exercise of prosecutorial discretion. (Cf. *Keenan* v. *Superior Court, supra,* 126 Cal.App.3d 576, 581-585.) "[T]he exercise of prosecutorial discretion does not deprive a defendant accused of a capital offense of his constitutional rights." (*Id.,* at p. 584; see *Gregg* v. *Georgia* (1976) 428 U.S. 153, 199 [49 L.Ed.2d 859, 889, 96 S.Ct. 2909, 2937] [plurality opn. of Stewart, Powell, Stevens, JJ.].)

In light of the foregoing discussion, we hold that the decision of the district attorney to seek the death penalty was not random, arbitrary or capricious. Therefore, we reject petitioner's contention that the imposition and execution of the death penalty based on that decision would constitute cruel and/or unusual punishment under the United States and California Constitutions. (*Gregg* v. *Georgia, supra,* 428 U.S. 153, 188-189 [49 L.Ed.2d 859, 883, 96 S.Ct. 2909, 2932-2933] [plurality opn. of Stewart, Powell, Stevens, JJ.]; *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726]; *People* v. *Frierson* (1979) 25 Cal.3d 142, 172-188 [158 Cal.Rptr. 281, 599 P.2d 587]; *Keenan* v. *Superior Court, supra,* 126 Cal.App.3d at pp. 581-585.)

Our conclusions (i) that the penalty trial "waiver and agreement" is not a specifically enforceable contract and (ii) that the district attorney's decision to seek the death penalty for petitioner did not violate the federal or state Constitutions, makes it unnecessary to address petitioner's final con-

tention that the People should be estopped from seeking the death penalty against petitioner.

## CONCLUSION

In the discharge of the prosecutorial function, the right and duty to examine and reexamine facts, existing or newly discovered, is a power so certain that to say that one who utters a quasi-judicial opinion must hold to it at the peril of threatening an interference with the pressing purposes of the law would be the statement of an absurdity.

In a search for the ultimate truth, no tongue need be mute, no deed left undone.

## DISPOSITION

The alternative writ is discharged and the peremptory writ of mandate is denied.

Klein, P. J., and Danielson, J., concurred.

Petitioner's application for review by the Supreme Court was denied June 20, 1986.