# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NICOLE BRADLEY,
          *Petitioner-Appellant,*

v.

GLORIA HENRY, Warden,
          *Respondent-Appellee.*

No. 04-15919

D.C. No.
CV-03-03034-PJH

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, District Judge, Presiding

Argued and Submitted
April 11, 2005—San Francisco, California

Filed June 22, 2005
Amended October 17, 2005

Before: Warren J. Ferguson, John T. Noonan, and
Pamela Ann Rymer, Circuit Judges.

Opinion by Judge Noonan;
Concurrence by Judge Ferguson;
Dissent by Judge Rymer

14135

## COUNSEL

Dennis P. Riordan, San Francisco, California, for the petitioner-appellant.

Morris Beatus, Deputy Attorney General, San Francisco, California, for the respondent-appellee.

## ORDER

The opinion filed on June 22, 2005 is amended as follows:

Slip op. p. 7454, ¶ 1, l.4. Insert "potentially" before "capital".

Slip op. p. 7454, ¶ 2, l.6. At "executed", substitute comma for period and add "if the prosecutor chose to seek the death penalty."

Slip op. p.7463, ¶ 3, l.4. Substitute "Potentially on" for "On".

Slip op. p.7463, ¶ 3, l.4. Add after "palpable":

Until the robbery-murder special circumstance charge was dismissed, a dismissal that occurred after completion of the prosecutor's case, the prosecutor could have asked for the death penalty. *Leo v. Superior Court*, 225 Cal. Rptr. 15 (Cal. Ct. App. 1986).

Slip op. p.7463, at the end of ¶ 3. Add the following new ¶:

In the petition for rehearing, the state cites *Morris v. Slappy*, 461 U.S. 1, 13 (1983), denying that a defendant has a right to a "meaningful attorney-

client relationship," adding, "[n]o court could possibly guarantee that a defendant will develop that kind of rapport with his attorney — privately retained or provided by the public." There is no doubt that this line of thought establishes the current test for ineffective assistance of counsel. Bradley, however, does not raise an ineffective assistance of counsel claim and her assertion of constitutional error in excluding her from a critical phase of the trial should not be collapsed into such a claim. The error, according to established Supreme Court precedent, was to exclude her from a critical stage of her trial.

As a result of that exclusion, she did not participate in the termination of her contract with her existing counsel and in the selection of her new counsel. Judicial inability to guarantee a good lawyer-client relationship cannot be converted into a judicial ability to break a lawyer-client relationship without hearing the client or into a judicial ability to select another lawyer without hearing the client. Not only was harm done to Bradley in depriving her of her existing counsel without notice to her. Not only were her lawyers replaced but the man replacing them was explicitly approved by the prosecutor, a method of selection that deprived Bradley of her basic freedom to choose her own counsel. Not only was harm done to Bradley by denying her any say in the choice of new counsel. These harms were increased by the fact that the lawyer chosen by the court explored an insanity defense that Bradley did not want; contacted his client chiefly through his investigator and not in person; and, so alienated his client that she filed a complaint against him with the California State Bar and threatened to sue his firm. Two months before trial the lawyer-client relationship of Andrian to Bradley was a shambles. The trial court could not have guaranteed that the shambles would not have

occurred, but when it did occur as a result of a trial court's ex parte removal of counsel and ex parte substitution of new counsel, Bradley was denied due process of law as determined by federal law established by the United States Supreme Court.

Respondent's petition for rehearing and for rehearing en banc remains pending.

---

## OPINION

NOONAN, Circuit Judge:

Nicole Bradley appeals the judgment of the district court denying her habeas corpus petition. Holding that she was denied due process of law at a critical stage in her criminal trial with harm to her ability to defend herself in a potentially capital case, we reverse the judgment of the district court.

### FACTS AND PROCEEDINGS

On January 17, 1996, Bradley, 18 years old at the time, attempted a carjacking in the course of which the driver of the car was shot. On January 22, 1996, she was taken into custody and charged with attempted robbery, carjacking, possession of a short-barreled shotgun, and murder in the first degree, with special circumstances. If convicted, she could be executed, if the prosecutor chose to seek the death penalty.

At the time she was represented by Patrick Hutchinson, soon joined by Jack Montgomery. On March 15, 1996, Judge Tansil, the trial judge, disqualified Montgomery for conflict of interest. On June 10, 1996, Marteen Miller joined Hutchinson as counsel. On October 18, 1996, Hutchinson and Miller were replaced by Melvin Sacks. On December 13, 1996, Jamie Thistlewaite joined Sacks, and the court set trial for

April 14, 1997. On February 28, 1997, the trial date was continued to July 18, 1997 for calendar control. On July 3, 1997, the trial date was changed again to March 2, 1998. On November 12, 1997, Bradley moved to substitute Kerry Steigerwalt in place of Sacks and Thistlewaite. At the hearing on the motion, Judge Tansil stated that "this will be the last change in counsel." The judge also changed the trial date from March 2 to March 30, 1998. Cynthia M. Dunlevy joined Steigerwalt as Bradley's counsel.

On March 4, 1998, Judge Tansil held a hearing in camera attended by the district attorney of Sonoma County; the deputy district attorney prosecuting the case; an investigator from the district attorney's office; Dunlevy; and two lawyers new to the case, Chris Andrian and his partner Steve Gallenson. Bradley was not present. Dunlevy indicated that private investigators, inferentially hired by the father, had been watching the prosecutor. The district attorney said that the prosecutor's safety might be at risk, that the father would use any strategy to get a continuance, and that "someone" was planning a violent act to get a continuance; the clear implication was that it was the father. A theme of the conference was the interference of the father in the conduct of his daughter's case, the father's control of his daughter, and the father's danger to the prosecutor.

Also discussed was a proposed withdrawal of counsel. Dunlevy told Judge Tansil that she and Steigerwalt were moving to be relieved as counsel due to serious conflicts, including nonpayment for their services by the father. Dunlevy added: "I think, based on everything that has gone on, what's in the best interest of my client is that I'm doing what I'm doing . . . . She's definitely drowning . . . ." The presence of the two lawyers new to the case, Andrian and Gallenson, was explained by the fact that the court had approached Andrian about being appointed to represent Bradley. Inferentially it is evident that Dunlevy had already told the court of her desire to withdraw and had asked for help in getting a replacement.

Dunlevy informed the court that Bradley opposed her withdrawal and had retained Bradley's former lawyer, Hutchinson, to oppose Dunlevy's motion.

At the conclusion of the conference in camera, the proceedings were placed under seal and became inaccessible to Bradley at the time of trial. Judge Tansil in open court accepted Dunlevy's motion to relieve counsel, stating: "I am concerned that this case would never get to trial with retained counsel. The only way to get the case to trial is through appointed counsel . . . So the Court must take this action on behalf of the defendant Nicole Bradley . . . ." Bradley was present but did not speak. The court then appointed Andrian to represent Bradley, with Dunlevy continuing on a transitional basis. Dunlevy again told the court that Bradley would like Hutchinson, who was present in court, to speak on her behalf. The prosecutor objected, and the court refused to hear Hutchinson.

The trial date was postponed to October 26, 1998. On October 14, 1998, Bradley moved for a continuance and the following day she moved to replace Andrian. A hearing was held before Judge Owen, who was to be the trial judge. Andrian stated that there was a conflict between him and Bradley and that she had filed a complaint against him with the State Bar and had threatened to sue him personally. Andrian explained that his insurance carrier required him to stop communicating with a client who threatened to sue him. Bradley stated the ways in which she found Andrian's representation inadequate, and he responded. Judge Owen found that Bradley had not shown inadequate or ineffective representation. He suggested resolution of the insurance issue. By December 16, 1998, that problem was resolved by an agreement of the county to indemnify Andrian. Trial was reset for February 22, 1999.

On January 7, 1999, Bradley moved to substitute retained counsel, Jonathan Jordan, for Andrian. Bradley stated that her relationship with Andrian prevented any adequate defense. Jordan said he would be ready for trial. On January 19, 1999,

Judge Owen heard a hearing on this motion. Judge Owen expressed concern about the payment of Jordan. Jordan responded that his financial relationship with Mr. Bradley was "not a concern at this point." Judge Owen stated that there was significant danger of delay in substituting new counsel in a process that was almost "lawyer-churning," a process that had delayed trial for almost three years. He denied the motion to substitute Jordan and also Jordan's suggestion that he become associate counsel with Andrian.

The case went to trial before a jury in March, 1999. The prosecution's case was that Bradley had killed in the course of a felony. Her two juvenile accomplices testified against her, as did a police officer, to whom she had made admissions. No one testified that she had deliberately shot the driver. The shooting appeared to be unintentional. But it was the cause of death during the commission of the carjacking, a felony the witnesses blamed on Bradley. Bradley did not testify in her own defense. She was found guilty of murder in the first degree (Cal. Pen. Code § 187(a)), attempted carjacking (Cal. Pen. Code § 215(a)), and possession of a short-barreled shotgun (Cal. Pen. Code § 12020(a)). She received a sentence of thirty-five years to life in prison.

Bradley appealed, raising three issues: (1) disqualification of one of her initial counsel; (2) the conference in camera discussing Steigerwalt and Dunlevy's request to withdraw, an event characterized as a denial of the right to counsel and as denial of Bradley's right to be present at a critical stage; and (3) denial of appointment to Jordan.

The court of appeal for the first appellate district held that Montgomery had properly been disqualified because he had been given confidential information by one of Bradley's co-defendants. Bradley's exclusion from the conference in chambers was, if error, not structural, the court said and it went on to consider if the error was prejudicial, concluding that it was not because Dunlevy did not have funds to conduct a defense.

"Even if Bradley had been present at the hearing, she could not refute this point because she was not herself paying Dunlevy and therefore had no personal knowledge on the subject." The refusal to let Hutchinson address the court was treated as error, but error that was harmless, again because the lack of payment of counsel could not have been addressed by anything Hutchinson could say. Finally, the court held that it was reasonable to deny the appointment of Jordan, given the delay of trial by changes in the lawyers for the defendant; Jordan had not reviewed the twelve boxes of material that preparation for trial required; and there was no constitutional right to have Jordan added as co-counsel. On April 17, 2002, Bradley's conviction was affirmed. On July 10, 2002, the California Supreme Court summarily denied review.

On June 30, 2003, Bradley filed the present petition for habeas corpus. She contended that she had been denied her constitutional rights to due process, a fair trial, and counsel of her choice in violation of the Fifth, Sixth, and Fourteenth Amendments. The violations specified were the conference in camera on the withdrawal of counsel and the refusal to appoint Jordan. The district court held that the conference in camera was a critical stage but that Bradley's presence would not have contributed to the fairness of the proceeding and so her exclusion did not violate the rule laid down in *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). The district court added that it was neither an unreasonable determination of the facts nor contrary to clearly established federal law nor an unreasonable application of such law for the California appeals court to conclude that Bradley could not have refuted Dunlevy's report of not being properly paid and Dunlevy's account of the interference, past and prospective, of Bradley's father. The denial of appointment of Jordan was similarly held not to violate any established constitutional right.

Bradley appeals.

## ANALYSIS

*The statute governing our review*. Habeas corpus is a fundamental right secured by the Constitution of the United States. U.S. Const. art. I., § 9, cl. 2. Its exercise is presently governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d)(1). As governed by this statute, the great writ may be issued only if the state court's ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.*

It is not difficult to determine when a decision is contrary to federal law established by the Supreme Court: it is a decision reaching a different result from the result reached by the Supreme Court on "facts that are materially indistinguishable . . . ." *See Williams v. Taylor*, 529 U.S. 362, 406 (2000). It is more difficult to determine whether a state court's ruling "involved an unreasonable application" of controlling precedent from the Supreme Court. Nearly every case is different. The statutory term "unreasonable" invites debate as to what is or is not reasonable. "Applying a general standard to a specific case can demand a substantial element of judgment." *See Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). We are admonished that the test is not our view of what would be erroneous but what is "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 76 (2003).

No doubt there is an insidious implication in this admonishment that there is an entirely objective perspective on each case, whereas as we know: "We may try to see things as objectively as we please. None the less, we can never see them with any eyes except our own." Benjamin N. Cardozo, *The Nature of the Judicial Process* 13 (1921). We heed the Supreme Court's advice by attempting with our own subjec-

tive abilities to state what we think some hypothetical reasonable jurist would find to be the case.

**[1]** *The conference in camera*. We are given a relatively small set of precedents to consider, namely, "the holdings, as opposed to the dicta," of the Supreme Court. *Williams*, 529 U.S. at 412. We turn to the relevant cases. In *Stincer*, the Supreme Court held that the exclusion of the defendant from an in camera hearing to determine the competency of two child witnesses against him was not a denial of the defendant's rights under the Confrontation Clause or the Due Process Clause. *See Stincer*, 482 U.S. at 744-45. In the course of the opinion, Justice Cardozo's statement in *Snyder v. Massachusetts*, 291 U.S. 97, 108 (1934) was quoted that due process requires that the defendant be allowed to be present " 'to the extent that a fair and just hearing would be thwarted by his absence.' " *See Stincer*, 482 U.S. at 745.

**[2]** In *Rushen v. Spain*, 464 U.S. 114 (1983) the trial judge interviewed a juror about her knowledge of a murder connected with the Black Panthers, six of whom were on trial; their counsel were not present. The Supreme Court stated: "Our cases recognize that the right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant." *Id*. at 117. The Court went on to hold that "the alleged constitutional error [was] harmless beyond a reasonable doubt." *Id*. at 121.

In *United States v. Gagnon*, 470 U.S. 522 (1985), the trial judge conducted an interview with a juror without the defendants being present but with the relevant defendant's lawyer on hand. The Supreme Court quoted *Synder* as a statement of the decisive principle and went on to find that the defendants could have contributed nothing to the conference. *Id*. at 527. Further, the Court found that the defendants "neither then nor later in the course of the trial" asserted their right to be present and "did not even make any post-trial motions, although

post-trial hearings may often resolve this sort of claim." *Id.* at 528.

**[3]** *Snyder* involved the jury's viewing the crime scene in the absence of the defendant, *see Snyder*, 291 U.S. at 103-05; *Stincer* involved the competency of two children as witnesses. *See Stincer*, 482 U.S. at 732-34. Each case was focused chiefly on a defendant's rights under the Confrontation Clause. In *Snyder*, the statement as to when a defendant has the right to be present appears to be not essential to the holding; the same is true of *Stincer*'s quotation of *Snyder*. *Spain* and *Gagnon* each deal with communications between a judge and a juror. In neither case was the absence of the defendant dispositive. Are the statements on a defendant's right to be present to be disregarded as dicta?

At first the answer appears evident. The authority of the Supreme Court to determine what law must be used is an authority identical with the Supreme Court's supremacy in the system. As the Supreme Court says that only its holdings, not its dicta, must be followed in determining what is "established federal law," only its holdings may be applied.

Still, a doubt persists. Dicta in normal judicial parlance are statements of a court not necessary to its resolution of the case before it; holdings consist in the rules disposing of the case. But the Supreme Court often enough enunciates principles of law that are not actually applied in the case before it. The principles would be categorized as dicta if the court were not the Supreme Court. But these principles are treated by courts and commentators as established federal law.

In the most famous and most fundamental of such readings, Chief Justice Marshall in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803), set out the principle empowering the Supreme Court to invalidate an unconstitutional law: "It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it . . . . It is, emphati-

cally the province and duty of the judicial department to say what the law is." The Supreme Court went on to dismiss the case for want of jurisdiction. *See id*. at 175-76. All that was necessary for the decision was the holding that the Supreme Court had power to review legislation affecting its jurisdiction. Strictly speaking, Chief Justice Marshall's pronouncement on the comprehensive power of the judicial department to review legislation was a dictum. No one, however, doubts that it was a holding.

To illustrate by the case at hand, the district court treated *Stincer*, 482 U.S. at 745, as establishing the rule governing the defendant's presence at a critical stage in the process. The Supreme Court itself in *Stincer* treated Justice Cardozo's opinion in *Snyder*, 291 U.S. at 107-08, as having established the rule repeated in *Stincer*, viz, that due process requires the defendant to be present at every stage of the trial "to the extent that a fair and just hearing would be thwarted by his absence." *See Stincer*, 482 U.S. at 745 (quoting *Snyder*, 291 U.S. at 107-08). Similarly in *Spain*, the Court declared "Our cases recognize . . ." going on to assert the fundamental right to be present at each critical stage. *See Spain*, 464 U.S. at 117. The teaching was reiterated by the Court in *Gagnon*, 470 U.S. at 527.

It would be rash for us to disregard the pronouncement of Justice Cardozo and its acknowledgment in *Stincer* and *Spain* and *Gagnon* because a technical reading of these cases could classify the relevant principle as dicta. The Constitution lives by such comprehensive commentary from the Supreme Court. We cannot deprive the document of vitality by squeezing great principles into a dustbin labeled dicta. We apply as established federal law the broad principle set out in *Snyder, Stincer, Spain* and *Gagnon.* This approach appears to be confirmed by the gloss written by the Supreme Court on "holdings, as opposed to dicta." Quoting this language from *Williams*, the Court said: "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal princi-

ple or principles set forth by the Supreme Court at the time the state court renders its decision." *See Lockyer*, 538 U.S. at 71-72 (quoting *Williams*, 529 U.S. at 405, 413). We, therefore, apply established governing principles.

**[4]** In the instant case, the conference in camera was a critical stage in the prosecution of Bradley. Her exclusion from it, apparently deliberate and without notice, deprived her of the opportunity to speak to the choice of counsel. She had no absolute right to choose her counsel. *United States v. Wheat*, 486 U.S. 153, 159 (1988). Absence of an absolute right does not reduce a defendant in a capital case to a zero in the delicate decision as to who will represent her as she stands trial for her life.

To obtain reversal of the judgment, does Bradley have to show that she suffered harm beyond the fact of her exclusion? The Supreme Court has stated: "Obtaining reversal for violation of such a right does not require a showing of prejudice to the defense, since the right reflects constitutional protection of the defendant's free choice independent of concern for the objective fairness of the proceeding." *See Flanagan v. United States*, 465 U.S. 259, 268 (1984). This pronouncement was made in the course of a decision focused on the appealability of an order disqualifying counsel. Technically, it was dicta. In terms of Supreme Court practice, it appears to be a statement of constitutional principle and therefore to constitute federal law established by the Supreme Court. However, the en banc majority in *Campbell v. Rice*, 2005 U.S. App. LEXIS, at *10-11 (9th Cir. 2005) did not apply this principle but required a showing of prejudice by the defendant to obtain reversal of his conviction.

**[5]** We need not resolve the dilemma of whether we are bound by this recent circuit precedent or by the Supreme Court's pronouncement of principle, because in our case the harm to Bradley is palpable. Until the robbery-murder special circumstance charge was dismissed, a dismissal that occurred

after completion of the prosecutor's case, the prosecutor could have asked for the death penalty. *Leo v. Superior Court*, 225 Cal. Rptr. 15 (Cal. Ct. App. 1986). Potentially on trial for her life, with witnesses against her who had participated in the crime, she needed a lawyer whom she could trust, with whom she could communicate freely, who would be her friend, her champion, her sagacious counselor. As her subsequent unhappy relationship with Andrian demonstrates, he was none of these but an incubus she sought to rid herself of. The constitutional injury inflicted in her exclusion from the in camera conference had these clear harmful consequences.

In the petition for rehearing, the state cites *Morris v. Slappy*, 461 U.S. 1, 13 (1983), denying that a defendant has a right to a "meaningful attorney-client relationship," adding, "[n]o court could possibly guarantee that a defendant will develop that kind of rapport with his attorney — privately retained or provided by the public." There is no doubt that this line of thought establishes the current test for ineffective assistance of counsel. Bradley, however, does not raise an ineffective assistance of counsel claim and her assertion of constitutional error in excluding her from a critical phase of the trial should not be collapsed into such a claim. The error, according to established Supreme Court precedent, was to exclude her from a critical stage of her trial.

As a result of that exclusion, she did not participate in the termination of her contract with her existing counsel and in the selection of her new counsel. Judicial inability to guarantee a good lawyer-client relationship cannot be converted into a judicial ability to break a lawyer-client relationship without hearing the client or into a judicial ability to select another lawyer without hearing the client. Not only was harm done to Bradley in depriving her of her existing counsel without notice to her. Not only were her lawyers replaced but the man replacing them was explicitly approved by the prosecutor, a method of selection that deprived Bradley of her basic freedom to choose her own counsel. Not only was harm done to

Bradley by denying her any say in the choice of new counsel. These harms were increased by the fact that the lawyer chosen by the court explored an insanity defense that Bradley did not want; contacted his client chiefly through his investigator and not in person; and, so alienated his client that she filed a complaint against him with the California State Bar and threatened to sue his firm. Two months before trial the lawyer-client relationship of Andrian to Bradley was a shambles. The trial court could not have guaranteed that the shambles would not have occurred, but when it did occur as a result of a trial court's ex parte removal of counsel and ex parte substitution of new counsel, Bradley was denied due process of law as determined by federal law established by the United States Supreme Court.

The state seems to imply that the security of the court required Bradley's absence from the conference. But information as to her father's conduct could have been furnished the court without any exploration of replacement of counsel. Nothing in the record appears to justify the conflation of reports on the menace of the father and the appointment of Andrian without Bradley's participation.

**[6]** We know that she objected to the withdrawal of Dunlevy and Steigerwalt. We know that, because of the prosecutor's objection, she was denied the opportunity to present her objection in open court through retained counsel, Patrick Hutchinson. We know that in this ex parte fashion the contract between client and lawyer was dissolved without the client having a word to say. We know that at the in camera conference, with the district attorney and the prosecutor assenting, a lawyer was selected for her by the court as to whom she was not asked to consent. A fair and just hearing was thwarted by Bradley's absence from the conference in Judge Tansil's chambers.

True, Judge Tansil was dealing with a difficult situation: the two changes in counsel apparently caused by the defen-

dant's father. But, so far as the record shows, these changes were not the only cause for the slow pace. Impatience, however understandable, cannot short circuit due process, and due process cannot be abandoned because it is difficult to assure.

**[7]** What went on later in open court was pro forma; Judge Tansil had already decided on his course of action. The California court of appeal held Bradley's absence from the conference harmless because she by herself would have been helpless to assure the payment of counsel. Surely, however, she would have been able to say whether Andrian was a lawyer that she wanted to have. Surely, she could have said whether or not she wanted a lawyer selected for her by the court. Surely, the ground for future conflict was laid by this choice of counsel for her with the approval of her adversary. On these points, there are no findings of fact by the California court of appeal. There was only an unreasonable application of established federal law.

For the reasons stated, the judgment of the district court is REVERSED. The case is REMANDED to the district court to issue the writ.

---

FERGUSON, Circuit Judge, concurring:

I agree with the majority opinion but write separately to underscore that Bradley was not only deprived of her right to due process by being excluded from the in-camera hearing. *See Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). She was also deprived of her Sixth Amendment right to select counsel of her choice as an effect of that exclusion.

At the in-camera hearing, the trial judge effectively sealed Bradley's ability to maintain and secure counsel of her choice in a capital case. First, the judge inexplicably refused to let Bradley's former attorney, Patrick Hutchinson, speak on

Bradley's behalf even though he was representing her interest in not having Cynthia Dunlevy withdraw as her present counsel. Second, the judge substituted retained counsel with appointed counsel without ever asking for or learning Bradley's opinion. While the dissent correctly asserts that a defendant has no right to insist on counsel she cannot afford, *see Wheat v. United States*, 486 U.S. 153, 159 (1988), the judge never asked Bradley about her financial condition. Rather, he silenced her entirely, the effect of which was to divest of any value or weight Bradley's Sixth Amendment right to counsel of choice. This is an error that is per se prejudicial, structural, and requires automatic reversal. *Flanagan v. United States*, 465 U.S. 259, 268 (1984) ("Obtaining reversal for violation of such a right does not require a showing of prejudice to the defense, since the right reflects constitutional protection of the defendant's free choice independent of concern for the objective fairness of the proceeding."). Because our system of justice cannot condone a judge's unconstitutional treatment of any criminal defendant, I concur in the majority opinion.

---

RYMER, Circuit Judge, dissenting:

For some reason, the majority discourses on objectivity and subjectivity, doubt and certainty, dicta and principles and holdings, when we have a straightforward question to answer: was the California Court of Appeal's decision contrary to, or an unreasonable application of, clearly established federal law as declared by the United States Supreme Court, 28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 73-76 (2003), in holding that Nicole Bradley was not prejudiced by her absence from a critical proceeding where her attorneys were allowed to withdraw on the ground that they were not getting paid by Bradley's father (as they were supposed to be) and new counsel was appointed in their stead; or that the trial court's refusal to substitute another retained counsel for appointed counsel on the eve of trial, after more than three

years of lawyer-churning, did not offend the Sixth Amendment. In my view, the court of appeal's decision reasonably applied Supreme Court precedent because *Kentucky v. Stincer*, 482 U.S. 730, 746 (1987), held that a defendant is not deprived of due process when she is excluded from a hearing that bears no "substantial relationship to [her] opportunity better to defend [her]self at trial." And *Wheat v. United States*, 486 U.S. 153, 159 (1988), made clear that a defendant is not necessarily denied her right to counsel when she is represented by effective counsel, whether or not that counsel is her preferred counsel. As neither statutory ground for issuance of the writ appears, I would affirm.

I

One need not condone Bradley's exclusion from the March 4, 1998 in-chambers hearing where Kerry Steigerwalt and Cynthia Dunlevy's motion to withdraw was granted and Chris Andrian was appointed in their stead, to conclude that the California Court of Appeal did not unreasonably apply Supreme Court precedent. Bradley argued there, as she does here, that excluding her was error, that the error was structural, and that reversal of her convictions is required. However, as the Supreme Court has made clear, "th[e] privilege of presence is not guaranteed 'when presence would be useless, or the benefit but a shadow.' " *Stincer*, 482 U.S. at 745 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 106-07 (1934)); *see also Rushen v. Spain*, 464 U.S. 114, 117 n.2 (1983) (per curiam) (holding that defendant's exclusion from ex parte, in-chambers communication between trial judge and juror was trial error subject to harmless error review); *Campbell v. Rice*, ___ F.3d ___, 2005 WL 1189650, at *4-*5 (9th Cir. May 20, 2005) (en banc) (so construing Supreme Court precedent).

The main subject of the hearing was Bradley's father's ability to pay trial fees. Bradley's counsel were retained, but she was not paying them; her father was. Dunlevy represented that Bradley's father was not providing sufficient funds to

conduct a defense or pay experts. The court of appeal found that even if Bradley had been present, she could not have refuted this point because she had no personal knowledge about whether Dunlevy was being paid. Bradley points to no evidence to the contrary. In any event, she had no right to insist on counsel she could not afford. *Wheat*, 486 U.S. at 159. The other topic at the hearing was Dunlevy's concern that someone (Bradley's father) was having the prosecutor followed and investigated. Bradley had nothing to contribute to this discussion, either.

Thus, nothing transpired that dealt with the charges against Bradley, the substantive testimony of any witnesses, or anything else relating to Bradley's guilt or innocence. *Cf. Stincer*, 482 U.S. at 745-47 (holding that exclusion of a defendant from an ex parte in-chambers hearing at which the competency of two child witnesses was determined did not violate due process). Nor was Bradley's ability to defend herself jeopardized because counsel who could try the case was appointed. Finally, as the court of appeal found, the trial judge's ruling would have been the same no matter what Bradley might have said because of the age of the case and the parade of retained attorneys who had been stymied in their representation of Bradley by her father's interference. In these circumstances, the California court's conclusion is not an unreasonable application of *Stincer*.

## II

*Wheat* controls Bradley's contention that the trial court's denial of her January 7, 1999 motion to substitute Jonathan Jordan for Chris Andrian violated her Sixth Amendment right to counsel of choice. "[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom [s]he prefers." 486 U.S. at 159.

Bradley had gone through a half-dozen retained lawyers when Andrian was appointed and before she sought — thirty-five days in advance of trial — to change again to retained counsel. Two of her most recent sets of retained attorneys had not been paid enough to fund Bradley's defense. Bradley did not know whether she personally had the resources to pay Jordan; Jordan indicated only that the financial relationship between him and Bradley's father was not a concern "at this point." Despite Jordan's belief (also "at this point") that he could be ready for trial in thirty-five days, his consultation up to that point had been minimal and he had not yet begun to tackle the materials, which were voluminous. Preparation would not be simple because this was still a special circumstances case. Given the historical interference with timely resolution of the case by hiring and firing of lawyers, the trial court was understandably concerned that Bradley (or her father) could again attempt to manipulate the system. The judge was also influenced by the fact that Andrian was court-appointed, had the assistance of well-qualified staff, and was prepared to try the case when set. The matter had been pending for three years, and Bradley had long since been warned that no further substitutions, and no further continuances, would be allowed. I cannot say that the California Court of Appeal unreasonably applied *Wheat* in upholding the trial court's determination.