[No. 12929-5-I.   Division One.   February 18, 1986.]

THE STATE OF WASHINGTON, *Respondent,* v. STEPHEN D. CAREY, *Appellant.*

*Raymond H. Thoenig, Julie A. Kesler,* and *Kim S. Wakefield* of *Washington Appellate Defender Association,* for appellant.

*David S. McEachran, Prosecuting Attorney,* for respondent.

COLEMAN, J.—Stephen D. Carey appeals his convictions for two counts of aggravated murder, one count of attempted first degree murder, and one count of first degree arson. We affirm.

Due to the complex factual circumstances in this case,

our recitation of the facts[1] is divided into three sections: (1) background facts; (2) facts relating to the events of February 25, 1982; and (3) post–fire facts and expert testimony.

## BACKGROUND FACTS

In 1981, appellant Stephen Carey, his wife, Janis, and their infant son, Chad, lived in a mobile home in Blaine, Washington. The Careys were experiencing marital problems, and the couple separated briefly during the spring of 1981. In September of that year, Janis Carey began dating Steve Talmadge. Although the Careys were still married and living together, Janis began spending nights with Talmadge. Appellant eventually learned that Janis was staying with Talmadge, but he testified that he never expressed any anger or made any threats toward either Janis or Talmadge. However, certain witnesses recounted contrary statements and/or actions of appellant. For instance, the Careys' baby–sitter, Bobbie Prevost, gave the following testimony:

Q. During this time period, and I'll relate to January and February of 1982, did the defendant have any conversation with you in which he indicated how he was treating Janis?
A. Yes, sir, he did.
Q. And could you describe that to us, please.
A. He come to my home one evening and asked me if I would watch Chad for a little while. I told him yes, and I then asked him if he knew for approximately how long, and he said, a couple of hours, and he didn't return until approximately six hours later. And when he came in, I asked him what had happened and he said, that he had been down hassling Janis at the tavern where she was working.
Q. Did you speak to him about that?
A. Yes, sir, I did.

---

[1]Only part of our opinion in this case will be published. In order to simplify bifurcation of the opinion, we have included the same statement of facts in both the published and unpublished portions of the opinion. Therefore, many of the facts recited here do not directly relate to the issues discussed *infra*.

Q. What occurred during that conversation?

A. He said, that he just didn't like the jerk that she was living with and that Janis was his and nobody else was going to have her. I told him, that he was talking crazy and to knock it off . . .

Another witness testified that 3 months prior to Janis Carey's death, during the summer of 1981, he heard appellant say "if I can't have her, nobody can."

Also, though several witnesses testified that appellant did not have a reputation for being violent, combative, vindictive, or holding grudges, impeaching evidence was offered through inquiry into knowledge of specific conduct suggesting a contrary disposition.

Finally, it was undisputed at trial (1) that appellant owned a yellow Camaro with a hood scoop at the time of the trailer fire; and (2) that a gas can was loaned to appellant by Steven Rauch before the fire, and appellant returned the can to Rauch after the fire.

### FACTS RELATING TO THE EVENTS
### OF FEBRUARY 25, 1982

On the evening of February 24, 1982, several people noticed a yellow Camaro with a hood scoop in the vicinity of the Careys' trailer. Constable Patrick Kokesch of the Royal Canadian Mounted Police testified that he noticed a yellow Firebird– Camaro–type automobile with a high hood scoop parked in a parking lot near the trailer between 11 p.m. and 12 midnight on February 24. Constable Kokesch recognized this vehicle as belonging to Steven Rauch.[2] A few days after the February 25 fire, Constable Kokesch saw this vehicle being photographed by a member of the Blaine Police Department. He later contacted the police and told them that this was the same vehicle he saw on the evening of February 24, 1982.

Feanette Swanson, a neighbor of the Careys, heard a loud

---

[2]Constable Kokesch was unaware that Rauch had sold his yellow Camaro to appellant.

car[3] at approximately 12:30 a.m. on the morning of February 25, 1982. She looked out her window and "saw Stephen Carey's car go by." Swanson testified that she was familiar with appellant's car and had seen it go by "a lot of times."

Vicki Johnson, who lived approximately one–half block away from the Carey trailer, was also very familiar with appellant's car. She testified that she saw his car go by sometime between the hours of 9 p.m. and 1 am. on the night in question.

Polla Swope testified that she was familiar with appellant's vehicle, and that she saw the vehicle approximately three blocks away from the Carey trailer around 4 to 4:30 a.m. on February 25. The vehicle was traveling very slowly through an intersection, and the driver would have been able to see flames coming from the Carey trailer if it was on fire at that time.

Janis Carey and Steve Talmadge went to bed in the trailer owned by the Careys at approximately 1 a.m. on February 25, 1982. Sometime later Janis woke Talmadge and said she had heard a noise. Talmadge smelled smoke. He got up and opened the bedroom door. Suddenly the room was "in turmoil" and there seemed to be an explosion. As he turned to run for the window, the room became engulfed in flames. He broke a window, dove through it, and then pulled Janis out of the trailer. Though Janis and Talmadge were badly burned, they managed to walk to the nearby home of Feanette Swanson. After Swanson awoke and let Janis and Talmadge into the house, Janis explained that there had been a fire at her trailer, and they were unable to get her 20–month–old child out. Swanson immediately called the fire department and began attending to Janis's burns.

Around 4:20 a.m., Janis asked Swanson to call appellant

---

[3]A friend of appellant testified that she heard a loud car pass by her house between 11 p.m. and 12 midnight on February 24. Her house is located within one block of the Carey trailer. The witness was very familiar with the sound of appellant's vehicle, and since she believed that the loud car was appellant's, she and her husband stayed up in anticipation of appellant stopping by their house.

and tell him about the fire. Janis gave appellant's phone number to Swanson, and Swanson dialed the number. She let the phone ring 10 to 15 times, but there was no answer. At the request of Janis, Swanson then called Paul Bond's residence in an attempt to locate appellant. Swanson spoke to Bond's girl friend, Sherry Wheeler, who stated that she would attempt to contact appellant. Between 4:23 and 5 a.m., Sherry Wheeler made three phone calls to appellant's residence. The calls were not answered.

Janis Carey and Stephen Talmadge were taken to St. Luke's Hospital in Bellingham and were later driven to Harborview Medical Center in Seattle where Janis died from severe burns. Prior to leaving St. Luke's Hospital in Bellingham, Janis Carey asked nurse Dana Hodak to call appellant. Hodak called appellant's number between 5:55 and 6:05 a.m. Appellant answered the phone and Hodak told him about the fire. This was the same number that Feanette Swanson and Sherry Wheeler had called earlier without success.

With respect to his phone conversation with appellant, Hodak testified that appellant sounded sleepy. He also testified that appellant's first question was, "Where is my child, or How is my child? What happened to him to the child?". Hodak told appellant that his wife had been severely burned, but did not inform him that his son, Chad, was dead.

Minutes later, a friend of appellant, Scott Chance, arrived at appellant's residence. Appellant answered the door in his bathrobe. Chance testified that appellant appeared confused and that his hair was "messed up" as if he had been sleeping on it. Appellant told Chance that St. Luke's Hospital had called and said that there was an explosion at the trailer.

During this conversation, appellant received a call from Officer Rick Williams of the Blaine Police Department. Williams told appellant that Chad had died in the fire and that Steve Talmadge and Janis Carey were en route to Harborview Medical Center in Seattle. At that point,

appellant started to cry and handed the telephone to Chance.

Shortly thereafter, appellant called Bobbie Prevost. Prevost testified as follows:

Q. Did you have the occasion to speak to the defendant after Rick Williams made his call?

A. Yes, I did.

Q. And would you please describe that to us?

A. I'm not sure of the time that Rick had been gone. The phone rang and I answered it, "Anchor Inn Motel." It was Stephen Carey on the phone and he wanted to know where baby Chad was.

Q. What did you tell him, Bobbie?

A. Well, I was quite upset and I said I was presently— Rick had called him and he knew what had happened to baby Chad, and he kept saying, What's going on, where is he? I said, He's gone, Stephen, he's dead.

Q. Did he indicate to you any surprise that Chad was not with you?

. . .

A. Yeah, he was a little upset when we were talking on the phone and he said, was I sure that Chad wasn't there? I said, No, Chad wasn't with me, he was at the trailer, plans had changed.

### Post–Fire Facts and Expert Testimony

Fire Chief Jerry Joubert arrived at the burning trailer at approximately 4:08 a.m. He checked the doors to the trailer and found them unlocked.[4] A fire engine arrived a few minutes later, and firemen began extinguishing the fire. Two firemen entered the rear door of the trailer and found a concentration of bright yellow flame from floor to ceiling, "being kind of a column of fire."

At this time, Chief Joubert was told that an infant was still inside the trailer. He entered and found the body of Chad Carey. The child was dead, and his body was removed from the trailer.

While checking the scene for gas lines, Joubert found a

---

[4]Witnesses testified that Janis Carey always kept her doors locked and that no one had ever used the back door. Appellant had a set of keys for the trailer doors.

lawn mower and a gas can stored under the trailer. Other firemen went inside the trailer to check for hot spots, but none of them smelled any gasoline. Joubert also testified that he did not smell gasoline when he entered the trailer to look for Chad's body.

Firemen and paramedics eventually left the scene, but Chief Joubert had a police officer stay to provide security and to watch for the development of "hot spots" or rekindling of the fire.

The State Deputy Fire Marshal, Gerald Anderson, arrived at the scene at approximately 2:20 p.m. Since Chief Joubert had advised Anderson that the fire had originated in the area of the electrical furnace, Anderson checked the furnace and furnace area of the trailer. He then proceeded down the hallway to the bedroom and found a small scatter rug on the floor just outside the bedroom door. The rug gave off a strong odor of gasoline. Anderson then used his combustible products indicator in this area and received readings showing the presence of a flammable liquid. He noted that a flammable liquid pattern proceeded from the rear bedroom to an area in the hallway. Anderson then took rug samples and sent them to the Washington State Crime Laboratory. A laboratory examination revealed the presence of automotive gasoline in the samples.

## Expert Testimony

Dr. Bruce Ettling, a fire cause and origin expert, visited the fire scene on March 2, 1982, pursuant to a search warrant. Dr. Ettling examined the electrical system and appliances in the trailer. After examining these items and the fire scene, Dr. Ettling concluded that neither the electrical system nor the furnace had caused the fire.[5] He testified that flammable liquid in the hallway caused the fire. This opinion was shared by two other fire investigators and

---

[5]One of the experts testified that he went to the trailer during the trial, poured a glass of water on the carpet in the hallway, and observed the water flow into the furnace area. He concluded that gasoline poured on the hallway carpet would flow into the furnace area.

State Deputy Fire Marshal Anderson. The factors cited by these experts in support of their flammable liquid fire theory included: (1) the pattern of burning in the hallway; (2) the flammable liquid found; (3) the burning upward and away from the furnace; (4) the "column" of flame observed by fire fighters; and (5) the examination of the furnace and wiring by an expert.

Thomas McNerney, a fire origin expert, testified that the fire was accidental. In his opinion, the fire was probably caused by damaged electrical wiring. McNerney disagreed with the flammable liquid theory because: (1) it would be hard to conceive of any gasoline being left over after a 15–minute fire; (2) he did not find a definite flammable liquid pattern on the rug; (3) the damage to the hallway and the lack of damage to the rug, walls, doors, and windows were inconsistent with a flammable liquid fire; and (4) the windows were not heat crazed and broken.

An electrical engineer, Kernon Dennis, concluded that the fire was caused by the arcing of wires leading to the electrical furnace. Fire engineer Rexford Wilson also concluded that electrical arcing was the cause of the fire. He rejected the flammable liquid fire theory because: (1) a gasoline corridor fire could not have caused 25 minutes of fire in the furnace compartment; (2) if gasoline had been burning, the fire would have burned through the paneling within 2 to 4 minutes after the fire reached the paneling; (3) sooting on the windows indicated that it was not a flammable liquid fire; and (4) the gasoline found would have been completely consumed by the fire if it was in fact present during the fire.

### CONSTITUTIONALITY OF THE AGGRAVATED MURDER STATUTE

Appellant first contends that the prosecutor has discretion to choose a more severe sentence, on proof of identical facts, by charging a person with the crime of aggravated first degree murder instead of murder in the first degree, thus violating the equal protection clause. This argument is

without merit.

■ It is well settled that equal protection violations arise only through permitted prosecution of the same criminal act under different criminal classifications, *i.e.,* felony or misdemeanor. "Statutes which define one crime classification, *i.e.,* a felony or a misdemeanor, and permit only a variation in punishment do not violate the equal protection clause."

Courts of this state have thus recognized that the same crime may be committed in ways warranting harsh or lenient punishment. A prosecutor has the discretion to weigh the severity of the offense, criminal propensities of the accused, as well as the past criminal record of the accused, in seeking an appropriate punishment. Equal protection does authorize such unequal treatment upon a rational basis. Statutes authorizing varying punishments for the same criminal act do rest upon the rational distinction between motives and methods of commission of the crime. The constitution does not require this inequality be treated as equal.

(Footnotes omitted.) *State v. Edwards,* 17 Wn. App. 355, 360–61, 563 P.2d 212 (1977) (quoting *Jansen v. Morris,* 87 Wn.2d 258, 261, 551 P.2d 743 (1976)). Our State Supreme Court recently noted that the aggravating circumstances which elevate premeditated first degree murder to aggravated murder are not elements of a crime, but are "'aggravation of penalty' provisions which provide for an increased penalty where the circumstances of the crime aggravate the gravity of the offense." *State v. Kincaid,* 103 Wn.2d 304, 312, 692 P.2d 823 (1985). Thus, the *Kincaid* court did not interpret the aggravated murder statute as a description of a crime separate from first degree murder. Rather, the court treated the statute as a penalty enhancement provision and noted

that the Legislature did not place this new statute in RCW Title 9A, the Washington Criminal Code, but entitled the bill "AN ACT Relating to capital punishment" and enacted the new statute as a part of RCW Title 10, the criminal procedure title of the revised code.

(Footnote omitted.) *Kincaid,* at 309.

■ In the instant case, appellant could have been prosecuted for first degree murder or premeditated first degree murder with an aggravating factor. This was "not a situation where the State [could] prosecute under different statu[t]es defining different *classes* of crime for the same criminal acts." *State v. Workman,* 90 Wn.2d 443, 456, 584 P.2d 382 (1978). Rather, the prosecutor sought greater punishment[6] based upon statutorily recognized distinctions between premeditated first degree murder methods and motives. Where discretion to seek a greater penalty "is not arbitrary, capricious or based on unjustifiable standards, it does not deny equal protection." *Workman,* at 456; *State v. Lee,* 87 Wn.2d 932, 558 P.2d 236 (1976), *appeal dismissed,* 432 U.S. 901 (1977). We perceive no such problems with the aggravated murder statute. The prosecutor's discretion is controlled by his ability to meet the proof required by the statute.

If the State chooses to charge murder in the first degree through the commission of arson (felony murder), it is not required to prove premeditation—an element it would have to prove to establish aggravated murder. Likewise, if the State charges murder in the first degree by premeditation, it need not prove an aggravating factor. Thus, the proof requirements of felony murder and premeditated murder are not the same as the proof required to elevate the homicide to aggravated murder.

However, appellant apparently contends that the statutes violate equal protection because the State could have charged Carey in the alternative with felony murder and premeditated murder, and therefore the proof requirements would be the same as those required for aggravated premeditated murder with arson as the aggravating factor. We disagree.

---

[6]Though the aggravated murder instructions presented to the jury in this case were not written in the preferred manner (*i.e.,* treating aggravated murder as a penalty enhancement), our State Supreme Court has held that jury instructions may properly treat aggravated murder as a separate crime. *State v. Kincaid,* 103 Wn.2d 304, 313, 692 P.2d 823 (1985).

When felony murder and premeditated murder are charged in the alternative, only one method need be proved, and the jury *need not be unanimous* as to which method was proved so long as all 12 jurors unanimously conclude that one or both methods have been established. *State v. Ellison,* 36 Wn. App. 564, 676 P.2d 531 (1984). However, when the enhanced penalty for aggravated murder is sought, the State *must convince all 12 jurors* that the defendant had a premeditated intent to cause the death and, additionally, *all 12 jurors must be persuaded* that the specified aggravating factor was independently proved beyond a reasonable doubt. RCW 10.95.020. The prosecutor's discretion to charge is not unlimited; it is controlled by proof requirements which the prosecutor must fulfill in order to obtain the higher degree of punishment. *Cf. State v. Campbell,* 103 Wn.2d 1, 24–25, 691 P.2d 929 (1985). Thus, even assuming aggravated murder is a separate crime, this would not be a situation where a prosecutor could choose between two crimes requiring *identical proof* but involving different punishment.

Appellant also contends that certain of the aggravating factors listed in RCW 10.95.020 are unconstitutional because they do not sufficiently narrow the class of persons eligible for the enhanced punishment contained in the statute. *Zant v. Stephens,* 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733, 2742–43 (1983). This argument has been rejected by our State Supreme Court. *State v. Bartholomew,* 101 Wn.2d 631, 635–36, 683 P.2d 1079 (1984); *State v. Kincaid, supra* at 311.

Finally, appellant contends that the prosecutor's ability to seek either the death penalty or life imprisonment usurps the trial court's sentencing function and thereby violates the separation of powers doctrine. A similar argument was recently rejected by our State Supreme Court. *Campbell,* at 25–26. The *Campbell* court noted that RCW 10.95.040 "properly sets out a legislative standard to guide prosecutors." *Campbell,* at 26. The court went on to hold that the prosecutor's discretion to seek the death pen-

alty does not usurp the judicial sentencing function. In so holding, the court noted that

> the prosecutor can neither impose the sentence nor require that it be imposed. *People ex rel. Carey v. Cousins,* 77 Ill. 2d 531, 397 N.E.2d 809 (1979). In [*State v.*] *Dictado,* [102 Wn.2d 277, 687 P.2d 172 (1984),] we observed that the prosecutor's discretion in this regard is similar to his discretion in charging a crime: "The prosecutor does not determine the sentence; the prosecutor merely determines whether sufficient evidence exists to take the issue of mitigation to the jury." *Dictado,* at 298. The sentencing jury or the judge determines whether the statutory conditions to impose the death penalty are met.

*Campbell,* at 26. Likewise, where life imprisonment without parole is sought, the prosecutor merely determines whether sufficient evidence exists to take the issue of aggravation to the jury, and it is *the jury* that must ultimately determine whether the statutory conditions, here the presence of one or more aggravating circumstances, are met. Once facts sufficient to meet these conditions are established, the sentence mandated by the Legislature is triggered, and "legislative establishment of limitations on or the total exclusion of judicial discretion in sentencing . . ." is not "a violation of judicial power." D. Boerner, *Sentencing in Washington* § 3.3, at 3–4 (1985); *see State v. Bryan,* 93 Wn.2d 177, 181, 606 P.2d 1228 (1980); *State v. Monday,* 85 Wn.2d 906, 909–10, 540 P.2d 416 (1975). Thus, the statute does not violate the separation of powers doctrine.

### WARRANTLESS FIRE INVESTIGATION/EXPECTATION OF PRIVACY

Appellant contends that Fire Marshal Anderson's entry of the trailer 9 hours after fire fighters left the fire scene required an administrative warrant because possible rekindling of the fire had been ruled out, and Anderson's entry was entirely separate from the earlier emergency entry. On the other hand, the State argues (1) that Anderson's investigation was a continuation of the initial incomplete investigation into the cause of the fire, and (2) that appellant did

not have a reasonable expectation of privacy in the fire–damaged premises.

The United States Supreme Court recently outlined a test for the constitutionality of warrantless, nonconsensual entries into fire–damaged premises. *Michigan v. Clifford,* 464 U.S. 287, 291–92, 78 L. Ed. 2d 477, 104 S. Ct. 641, 646 (1984):

> Except in certain carefully defined classes of cases, the nonconsensual entry and search of property are governed by the warrant requirement of the Fourth and Fourteenth Amendments. The constitutionality of warrantless and nonconsensual entries onto fire–damaged premises, therefore, normally turns on several factors: whether there are legitimate privacy interests in the fire–damaged property that are protected by the Fourth Amendment; whether exigent circumstances justify the government intrusion regardless of any reasonable expectations of privacy; and, whether the object of the search is to determine the cause of fire or to gather evidence of criminal activity.

(Footnote omitted.)

■ As the *Clifford* Court noted, a defendant who challenges a warrantless fire investigation must have a reasonable expectation of privacy in the fire–damaged property. In the instant case, the trial court concluded that appellant had standing[7] to challenge the search of the trailer and entered the following relevant finding:

> 27. The defendant, Stephen D. Carey, had moved out of the trailer home and had established a residence in the City of Bellingham, and had boxed up his belongings and clothing and had placed them in a storage area underneath the trailer. The defendant retained a key to the trailer, and paid real estate taxes on the trailer and property for the year of 1982. There was no firm agreement as to disposition of the trailer and contents which remained community property.

---

[7]In its oral ruling, however, the court indicated that standing was a close issue, stating, "I have some qualms about standing in this case, but in view of the rest of my decision, it doesn't become critical. If, in fact, there is no standing, that would cure any errors that I'm making in regards to the search, so I don't want to rely primarily on that."

Thus, the trial court concluded that appellant retained a reasonable expectation of privacy in the fire–damaged property. The State assigns error to this conclusion in its cross appeal.

The test for determining whether a defendant retains a reasonable expectation of privacy in fire–damaged premises is essentially an objective one. *Clifford,* at 292. As the Supreme Court stated:

> Privacy expectations will vary with the type of property, the amount of fire damage, the prior and continued use of the premises, and in some cases the owner's efforts to secure it against intruders. Some fires may be so devastating that no reasonable privacy interests remain in the ash and ruins regardless of the owner's subjective expectations. The test essentially is an objective one: whether "the expectation [is] one that society is prepared to recognize as 'reasonable.'" *Katz* v. *United States,* 389 U. S. 347, 361 [19 L. Ed. 2d 576, 88 S. Ct. 507] (1967) (Harlan, J., concurring). See also *Smith* v. *Maryland,* 442 U. S. 735, 739–741 [61 L. Ed. 2d 220, 99 S. Ct. 2577] (1979). If reasonable privacy interests remain in the fire–damaged property, the warrant requirement applies, and any official entry must be made pursuant to a warrant in the absence of consent or exigent circumstances.

*Clifford,* at 292–93. The considerations noted by the *Clifford* Court are useful here.

First, the type of property involved in this case, *i.e.,* a home, is generally associated with a strong expectation of privacy. *Clifford,* at 295–97; *State v. Chrisman,* 100 Wn.2d 814, 822, 676 P.2d 419 (1984). However, the strength and reasonableness of this expectation diminish when, as in this case, the defendant does not reside in the home in question. The *Clifford* Court apparently recognized this proposition when it listed "the prior and continued use of the premises" as a consideration in assessing the reasonableness of a person's alleged expectation of privacy. *Clifford,* at 292.

In the present case, appellant did not reside in the fire–damaged premises and stayed there only when he was baby–sitting. Moreover, his wife had exclusive possession of the home's interior, and he had removed all of his personal

items which would normally be associated with an expectation of privacy. His only "use" of the property was storage of personal items in boxes underneath the trailer, and the parking of a vehicle, boat, and riding lawn mower on the property. Thus, his expectation of privacy in the trailer interior arises primarily from his ownership interest in the trailer. However,

Ownership alone is not enough to establish a reasonable and legitimate expectation of privacy. Ownership is relevant to the inquiry . . . but the total circumstances determine whether the one challenging the search has a reasonable and legitimate expectation of privacy in the locus of the search.

*United States v. Dall,* 608 F.2d 910, 914 (1st Cir. 1979); *accord, United States v. Rios,* 611 F.2d 1335, 1345 (10th Cir. 1979); *United States v. Haydel,* 649 F.2d 1152, 1154 (5th Cir. 1981); *United States v. Ramapuram,* 632 F.2d 1149, 1154 (4th Cir. 1980); *United States v. Salvucci,* 448 U.S. 83, 92, 65 L. Ed. 2d 619, 628, 100 S. Ct. 2547, 2553 (1980); *State v. Abramoff,* 114 Wis. 2d 206, 338 N.W.2d 502, 504–05 (Ct. App. 1983).

Another consideration mentioned in *Clifford* is the extent of fire damage. The Court's opinion suggests that expectations of privacy become less reasonable as the severity of the fire damage increases. *Clifford,* at 292. In the present case, the damage to the trailer was extensive in one area of the trailer and moderate in other areas. The fact that the premises suffered fairly extensive damage supports a conclusion that appellant's privacy expectations were less reasonable than they would have been if the premises had suffered only slight damage or no damage at all.

The final consideration mentioned by the *Clifford* Court is the efforts made by the owner to secure his fire–damaged premises against intruders. *Clifford,* at 292. The State correctly points out that appellant twice visited the fire scene prior to the warrantless investigation. He therefore had opportunities to secure the premises or otherwise manifest his expectation of privacy. Though he was aware that the

premises were being monitored by fire investigators and/or other officials, and though he visited the trailer twice during the monitoring period, he posed no objection to the official control being exercised over his premises. Nor did he assert any rights or prerogatives normally associated with an assertion of control or privacy expectations. The question, then, is whether a failure to take advantage of opportunities to secure fire–damaged premises indicates a diminished expectation of privacy. At least one court has answered this question in the affirmative. *People v. Zeisler*, 125 Ill. App. 3d 558, 465 N.E.2d 1373, 1375, *cert. denied*, 105 S. Ct. 1870 (1985).

In *Zeisler*, the defendant's apartment was heavily damaged but not completely destroyed. Though the defendant had personal property on the premises, he made no effort to secure the property and premises despite "ample opportunity to do so." *Zeisler*, at 561. The fire department eventually secured the apartment in order to preserve evidence. The court found

that the defendant's expectation of privacy was much less than in [ *Michigan v.*] *Clifford* [464 U.S. 287, 78 L. Ed. 2d 477, 104 S. Ct. 641 (1984)]. Accordingly, we do not believe that the defendant had a reasonable expectation of privacy in the fire damaged premises.

*Zeisler*, at 561.

We find the *Zeisler* analysis applicable here and conclude that appellant did not, in light of all the factors outlined above, have a *reasonable* expectation of privacy in the premises. We reach the same result analyzing the question independently under article 1, section 7 of our state constitution. While we recognize that our state constitution generally provides heightened protection for privacy interests, *Chrisman*, at 818, there are no unique factors here indicating that privacy protections would be heightened for a person who does not reside in a home, who does not maintain personal property of a private nature in the home, and who does not, when given the opportunity, assert or otherwise manifest a privacy expectation in the property.

The judgment is affirmed.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.

COLE, J. Pro Tem., concurs.[8]

Reconsideration denied March 14, 1986.

Review denied by Supreme Court June 3, 1986.

---

[8]Judge Corbett had indicated his concurrence prior to his death on February 8, 1986.