[No. 52971-4-I. Division One. December 19, 2005.]

THE STATE OF WASHINGTON, *Respondent*, v. MARK ALLEN ROOKS, *Appellant*.

*David B. Koch* (of *Nielsen, Broman & Koch, P.L.L.C.*), for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Amy R. Holt, Deputy*, for respondent.

¶1 SCHINDLER, J. — Mark Allen Rooks appeals his conviction for murder in the second degree of his ex-girl friend, Amanda Gurr. Rooks argues his constitutional right to be present at a critical stage of the trial was violated when he was excluded from an in-chambers conference to address his attorneys' motion to withdraw based on a conflict of interest. Rooks also argues the trial court erred in admitting his statements to the police including a 90-minute taped confession because the State failed to establish the corpus delicti of the crime; the prosecutor committed misconduct during jury selection, opening statement, and closing argument; and his attorney provided ineffective assistance of counsel in failing to propose an adequate ER 404(b) limiting instruction. Finally, Rooks claims the imposition of an exceptional sentence violated his right to a jury trial under *Blakely v. Washington*.[1] We affirm Rooks' conviction but remand for resentencing.

## FACTS

¶2 On July 11, 2001, Amanda Gurr, the 26-year-old ex-girl friend of Rooks and the mother of their young son, suddenly disappeared. The police located her remains on September 6, 2001, after Rooks' brother, Jeff Schomburg, told police Rooks admitted strangling Amanda to death on July 11 and described where to find her body.

¶3 Rooks and Amanda were involved in a troubled on-again-off-again romantic relationship. In 1996, Rooks and Amanda began living together in the Seattle area. When Amanda's older sister, Jessica Gurr, visited Amanda and Rooks, she said Rooks would not let Amanda and Jessica be alone together and Amanda always looked at Rooks before answering any questions. Jessica also recalled Amanda was uncharacteristically scared and nervous when she was unable to find the items on Rooks' grocery list. And when

---

[1] 542 U.S. 296, 301, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

they returned home without the items Rooks got upset at Amanda.

¶4  In fall 1997, Amanda moved to where Jessica lived in Oregon. Rooks followed Amanda to Oregon and moved in with her a couple months later. In July 1998, Rooks and Amanda had a son, M.R. After M.R. was born, Rooks constantly told Amanda she was not a good mother. Jessica said Rooks frequently berated Amanda, telling her she was irresponsible and stupid and she was lucky to be with him. When Amanda went to Jessica's house to visit her, Rooks called every 15 minutes and drove by the house if no one answered the phone. Every time Jessica took Amanda to run errands, they had to check in with Rooks and explain where they were going, how long they'd be gone, what they were going to buy, and who else was going to be there.

¶5  On at least 10 separate occasions Jessica saw bruises on Amanda. Jessica also testified that she witnessed Rooks hit Amanda two times. The first time, Rooks was yelling at Amanda and slapped her with an open hand. The second time Amanda called and asked Jessica to come pick her up at her house. When Jessica arrived Amanda was running from the back bedroom toward the front door with Rooks close behind chasing her. Rooks hit Amanda on the back of her head with a closed fist and Amanda nearly fell down from the force of the blow. Jessica picked up M.R., grabbed a pair of shoes for Amanda and went outside with Amanda. Jessica called the police and urged Amanda to leave Rooks. But when the police arrived Amanda refused to talk to them.[2]

¶6  While living in Oregon, Amanda became friends with Stacie Sandoval. Stacie testified that Rooks made rude remarks about Amanda's mothering skills. Stacie also observed bruising on Amanda's arm and testified about an occasion when she witnessed Rooks assault Amanda.

---

[2] Amanda's other sister, Elizabeth Gurr, also testified about seeing bruises on Amanda both times she visited her in Oregon.

Amanda called Stacie and asked her to pick her up at her house. When Stacie arrived, Amanda was walking down the road crying and shaking. Amanda asked Stacie to take her back to the house so she could get her three-month-old son. Amanda went in the house, and then ran towards Stacie's car with the baby. Rooks followed behind Amanda yelling. As Amanda handed the baby to Stacie, Rooks grabbed Amanda by the hair and threw her to the ground. Rooks tried to get the baby from Stacie, but Stacie refused and called the police. When the police arrived, Rooks admitted throwing Amanda on the ground and was arrested.

¶7 During the two-and-a-half years Amanda and Rooks lived together in Oregon, Amanda took M.R. and left Rooks at least five times. But Amanda always returned because Rooks said their son needed a father and he apologized each time for losing his temper.

¶8 In late 1999, Amanda took M.R. and moved to Alaska to live with her mother and younger sister, Elizabeth. Rooks traveled to Alaska to visit M.R., and Amanda let Rooks take M.R. for two hours. When Amanda went to Rooks' hotel room with Elizabeth and Elizabeth's fiancé to get M.R., Rooks refused to allow Amanda to take M.R. Elizabeth tried to get the police to intervene, but because the dispute was out of their jurisdiction they would not get involved. Rooks returned to Seattle with M.R.

¶9 Amanda left Alaska and moved back to Seattle to regain custody of M.R. When she returned, Amanda lived with her father, Steve Gurr, in Burien. Amanda learned that because Rooks reported Amanda was an unfit mother, Child Protective Services (CPS) had placed M.R. in protective custody with Rooks' mother, Diane Schomburg. To regain custody of M.R., CPS required Amanda to attend parenting classes and submit to random urinalyses. Rooks wanted sole custody of M.R., and according to the guardian ad litem, Rooks also wanted control of all decisions about his son. Amanda enrolled in and completed parenting classes, and her urinalyses were normal. Amanda had twice-weekly visitation with M.R. on Wednes-

day afternoons and Saturday afternoon until Sunday afternoon. Amanda never missed a visit with M.R.

¶10 Amanda and Diane Schomburg had arranged to meet at a park on Wednesday, July 11, 2001, for a picnic with M.R. When Amanda's father left for work that morning, she was awake but not dressed. Steve left Amanda his cell phone so she could call Diane Schomburg. At 9:48 A.M., Amanda called Diane Schomburg to confirm getting together for the picnic with M.R. later that morning. Amanda never showed up for the picnic with her son.

¶11 When her father returned from work at 6:45 P.M., Amanda was not home. The front door was unlocked, which was unusual, a half-eaten pizza was on the stove, and the stereo volume was turned up much higher than normal. Amanda typically left Steve a note if she was out but there was no note. At first, Steve thought Amanda's visit with M.R. might have lasted longer than expected. But when Amanda did not return by 9:30 that night, Steve tried to find her. The next morning, Steve located her purse, keys and cigarettes behind the dresser in her bedroom. Because Amanda hardly ever left home without her purse and keys, Steve called the police and reported Amanda missing.

¶12 In the evening of July 11 or 12, Rooks told his brother, Jeff Schomburg, that he had strangled Amanda on July 11 and described the remote area where he left her body. Rooks did not admit his involvement in Amanda's death to anyone else. Between July 11 and when Amanda's body was found in September, Rooks went to visit Steve Gurr several times to talk about Amanda and her sudden disappearance. Rooks always denied knowing anything about what happened to Amanda.

¶13 In late August, Jeff went to the area Rooks had described and saw Amanda's body. A couple of weeks later, on September 6, Jeff told the police that Rooks admitted killing Amanda and told them where to find her body.

¶14 The next day on September 7, the police found Amanda's remains at the location described by Jeff. The

area was thick with foliage. Amanda's body was lying in a drainage ditch about 20 feet away from a utility service road in Des Moines. That same day, the police told Rooks that they found Amanda's body and that Jeff told them Rooks admitted killing her. In a 90-minute taped statement, Rooks confessed to strangling Amanda on July 11. Rooks was charged with murder in the second degree, domestic violence.

¶15 According to the medical examiner, Amanda's body had been at the remote location for one to three months. Because her body was in an advanced state of decomposition, the medical examiner was unable to determine the manner and cause of death. The medical examiner could not rule out strangulation or drug overdose as the cause of death. The examiner found evidence that Amanda ingested cocaine within a few days of her death.

¶16 Relying on the medical examiner's findings, Rooks filed a pretrial motion to exclude his 90-minute statement to the police under the corpus delicti rule. In response, the State made an offer of proof and presented evidence independent of Rooks' confession to show Amanda's death was related to a criminal act. The trial court ruled the State met its burden to establish the corpus delicti and denied Rooks' motion to exclude his taped confession.

¶17 Rooks also filed a motion under ER 404(b) to exclude evidence of prior acts of physical abuse by Rooks against Amanda, Rooks' controlling and abusive behavior toward Amanda, Rooks' refusal to return M.R., and statements made by Amanda about her fear of Rooks. The court ruled that the history of Rooks and Amanda's relationship, including acts of domestic violence, Rooks' controlling and abusive behavior, and the child custody dispute were relevant to prove motive.[3]

¶18 At trial, the State introduced evidence about Amanda's sudden disappearance on July 11, testimony about the custody dispute, and testimony that Rooks physically and

---

[3] The court excluded statements about Amanda's fear of Rooks as irrelevant.

psychologically abused Amanda throughout their relationship. Rooks did not testify, but his taped statement in which he confessed to strangling Amanda on July 11 and dumping her body in a remote location was admitted and played to the jury. The defense theory was that Amanda died of a cocaine overdose. The defense relied on the medical examiner's findings and Jeff Schomburg's testimony that Amanda had a history of drug use, including using cocaine. Rooks argued the jury should discount Rooks' confession because he was distraught and confused. The jury convicted Rooks of murder in the second degree.

¶19 The trial court sentenced Rooks on the murder in the second degree conviction together with a separate conviction for indecent liberties and imposed an exceptional sentence based on finding that the murder of Amanda was a domestic violence offense and part of an ongoing pattern of psychological, physical, or sexual abuse. The court imposed the high end of the standard range for each conviction, 244 months for murder in the second degree and 82 months for indecent liberties, and ordered that the sentences run consecutively.[4] Rooks appeals.

## ANALYSIS

### In-chambers Conference

¶20 Rooks contends his constitutional rights were violated when he was excluded from a November 26, 2002 in-chambers conference that was scheduled by his attorneys to address a conflict of interest.

¶21 Rooks was represented by two attorneys from the Society of Counsel Representing Accused Persons (SCRAP), Lauren Carnell and Marvin McCoy. Carnell and McCoy represented Rooks in the murder case scheduled for trial in February 2003 and in an indecent liberties case scheduled for trial on December 2, 2002. In the Certificate of Counsel

---

[4] The standard range for Rooks' conviction for murder in the second degree was 144-244 months. The standard range for Rooks' conviction for indecent liberties was 62-82 months. Rook's total sentence was 326 months.

presented to the court before the November 26 hearing, the SCRAP supervisor described the conflict. Michael Maltos, a defendant in a separate case, was represented by two other SCRAP attorneys. Maltos was charged with robbery and if convicted at the trial scheduled for January, he was facing life without parole as a "Third Strike." The lawyers had submitted a mitigation package on behalf of Maltos in an effort to obtain a reduced charge. Maltos heard Rooks make incriminating statements and was considering having his lawyers approach the State to testify against Rooks in exchange for a reduced charge in his case. The SCRAP supervisor instructed Maltos' attorneys not to discuss the situation with Rooks' attorneys and told Rooks' attorneys not to inform Rooks of the nature of the conflict and thereby endanger Maltos. Based on the Washington State Bar Association's Formal Opinion 176, the SCRAP supervisor believed its attorneys had a duty to withdraw due to an irreconcilable conflict of interest in representing the two clients. But the SCRAP supervisor also contacted the Bar Association. According to the Bar Association, it was a conflict of interest under the Rules of Professional Conduct for SCRAP to continue to represent Rooks and Maltos and they should withdraw as soon as possible.

¶22 At the hearing on November 26, Rooks, his SCRAP attorneys, and the prosecutor were present. Rooks' attorneys made a motion to withdraw based on "undisclosable conflicts" in both of Rooks' cases and requested an in-chambers conference without Rooks or the prosecutor. The court convened an in-chambers conference with Rooks' attorneys.

¶23 During the in-chambers conference, the court stated it had reviewed the Certification of Counsel and Formal Opinion 176. The SCRAP attorneys also told the court that after a recent similar hearing held in Maltos' case, another judge ruled it was a conflict of interest for SCRAP to represent both clients. The court concluded the situation presented a fact pattern identical to one described in

Formal Opinion 176[5] and based on the information pre-sented concluded Rooks' counsel had a conflict of interest.[6]

¶24 After the in-chambers conference, the court ruled as a matter of law that Rooks' attorneys had a conflict of interest and had to withdraw.

> Mr. Ernsdorff and Mr. Rooks, since you weren't able to be privy to our chambers discussions, let me tell you that the attorneys disclosed the information that they have, and it's clear to this court as a matter of law that they have a conflict of interest that cannot be resolved and the need to withdraw from this case. And, in fact, the sooner they withdraw the better because you need new counsel who can pick up the files where your attorneys left off and come up to speed as quickly as possible in the case to represent you.

■■■ ¶25 Under the confrontation clause of the Sixth Amendment and the due process clause of the Fourteenth Amendment, a criminal defendant has a constitutional right to be present during all "critical stages" of the criminal proceedings. *United States v. Gagnon*, 470 U.S. 522, 526, 105 S. Ct. 1482, 84 L. Ed. 2d 486 (1985); *State v. Berrysmith*, 87 Wn. App. 268, 273, 944 P.2d 397 (1997).[7] A

---

[5] Formal Opinion 176 addresses conflicts of interest between criminal defendants. In the first fact pattern discussed in Formal Opinion 176, Client X was represented by one attorney in a law firm, and Client Y was represented by another attorney in the same firm. Both Client X and Client Y were in jail awaiting either trial or sentencing on criminal charges, and they were incarcerated in the same cell block. Client X informed his attorney of statements made by Client Y concerning facts related to the crime with which Client Y was charged. The Bar Association observed that while it would be beneficial to Client Y for his attorney to tell him not to make any further statements, such a warning could put Client X at risk. In addition to this conflict of interest regarding what to tell Client Y, because Client X could be called as a witness in Client Y's trial and Client X could potentially obtain favorable treatment from the prosecutor in exchange for his cooperation with the prosecution of Client Y, the Bar Association concluded the continued representation of Clients X and Y by attorneys in the same firm would violate the ethical rules that prohibit representation of multiple parties where the attorney's professional judgment on behalf of a client will be or is likely to be adversely affected by the attorney's representation of the other client.

[6] The Certification of Counsel and the record of the in camera hearing were sealed by the trial court. At the request of the State this court ordered the record unsealed.

[7] The Court in *Gagnon* held this right was based on the confrontation clause of the Sixth Amendment and the due process clause of the Fourteenth Amendment.

defendant has the right to be present at any stage of the criminal proceeding that is critical to the outcome if his presence would contribute to the fairness of the procedure. *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S. Ct. 2658, 2667, 96 L. Ed. 2d 631 (1987); *Berrysmith*, 87 Wn. App. at 273. But due process does not require the defendant's presence when it "would be useless." *Id.* (citing *Snyder v. Massachusetts*, 291 U.S. 97, 106-07, 54 S. Ct. 330, 78 L. Ed. 674 (1934)). When the right to confrontation is not implicated, the court must address two questions in determining whether the hearing was a critical stage in the proceedings. First, whether the subject of the hearing related to a purely legal matter; and second, if so, whether the absence of the defendant affected the opportunity to defend against the charge, "or whether a fair and just hearing was thwarted by his absence." *Berrysmith*, 87 Wn. App. at 273-74.

¶26 Under RPC 1.7(b):

A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) The lawyer reasonably believes the representation will not be adversely affected; and

(2) The client consents in writing after consultation and a full disclosure of the material facts (following authorization from the other client to make such a disclosure). When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

¶27 RPC 1.15(a)(1) requires withdrawal if "[t]he representation will result in violation of the Rules of Professional Conduct or other law."[8] "[T]he question of

---

*Gagnon*, 470 U.S. at 526. The due process clause applies in situations where the defendant is not actually confronting witnesses or evidence against him or her. *Id.*

[8] Rooks also relies on a similar potential conflict that was discovered six months before the conflict involving Maltos. In May 2002, former SCRAP client Lawrence Hell contacted law enforcement about statements Rooks allegedly made about the

whether an attorney's conduct violates the relevant Rules of Professional Conduct is a question of law." *Eriks v. Denver*, 118 Wn.2d 451, 457-58, 824 P.2d 1207 (1992).

¶28 Here, the Certification of the SCRAP supervisor and the record at the in camera hearing established that Rooks' attorneys believed their representation of Rooks was materially limited and adversely affected by their representation of another client. Based on this record, the court ruled as a matter of law that the concurrent representation of Rooks and Maltos by SCRAP created a conflict of interest under the Rules of Professional Conduct.

¶29 Rooks argues that if he had been present at the hearing, he could have asked whether Maltos was willing to disclose material facts to Rooks and waive the conflict. We reject Rooks' argument for two reasons. First, RPC 1.7(b) is written in the conjunctive. If a lawyer reasonably believes representation of a client will be adversely affected by the concurrent representation of another client, the question of waiver is not reached. Secondly, even if Rooks and Maltos had decided to waive the conflict, a waiver of a conflict of interest does not necessarily cure a conflict of interest and the court would not have necessarily accepted the waiver. In *Wheat v. United States*, 486 U.S. 153, 162, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988), the United States Supreme Court explained the policy reasons giving the court substantial latitude to reject a waiver:

"When a trial court finds an actual conflict of interest which impairs the ability of a criminal defendant's chosen counsel to

murder charge while in custody. Hell's report to law enforcement created the possibility that he, one of SCRAP's former clients, could be called to testify against Rooks, their current client. But Hell's contact with SCRAP attorneys was very limited (communicating a plea offer and discussing whether to accept it), and Hell was willing to waive any attorney-client communications he had with SCRAP. Based on Hell's full waiver, the court ruled there was no conflict of interest that would prevent Rooks' SCRAP lawyers from continuing their representation of him. Unlike the requirement under RPC 1.7 that a lawyer reasonably believe the representation of one current client will not adversely affect the relationship with the other client, the rule regarding conflicts of interests with former clients, RPC 1.9, only describes a conflict where the former client has not consented. The potential conflict due to Hell and the manner in which it was resolved is therefore not relevant to the conflict with Maltos and the in-chambers hearing.

conform with the [American Bar Association] Code of Professional Responsibility, the court should not be required to tolerate an inadequate representation of a defendant. Such representation not only constitutes a breach of professional ethics and invites disrespect for the integrity of the court, but it is also detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court and the subtle problems implicating the defendant's comprehension of the waiver."

*Id.* (quoting *United States v. Dolan*, 570 F.2d 1177, 1184 (3d Cir. 1978)). Under such circumstances, the court can elect to exercise its supervisory authority over members of the bar to enforce the ethical standard requiring an attorney to decline multiple representations. *Wheat*, 486 U.S. at 162 (citing *Dolan*, 570 F.2d at 1184).

¶30 We conclude the in-chambers hearing was not a critical stage of the proceedings at which Rooks had a right to be present because, as a matter of law, Rooks' attorneys had a conflict of interest requiring withdrawal.

¶31 This conclusion is consistent with our decision in *Berrysmith*. In *Berrysmith*, the defendant argued an in camera hearing was a critical stage of the proceedings because it involved the question of whether there was a sufficient factual basis for counsel's assertion that the defendant would commit perjury. This court held that the defendant had no constitutional right to be present at an in camera hearing in which the court allowed counsel to withdraw based on counsel's reasonable belief that the defendant would perjure himself and could not be dissuaded from doing so. *Berrysmith*, 87 Wn. App. at 276. In reaching this result, we ruled that the matter of the withdrawal of counsel is governed by ethical standards (i.e., RPC 1.15) and is, therefore, a matter of law. *Id.* at 274.

¶32 Rooks also relies on *Campbell v. Rice*, 408 F.3d 1166 (9th Cir. 2005) (en banc), *State v. Lopez*, 271 Conn. 724, 859 A.2d 898 (2004), and *Bradley v. Henry*, 413 F.3d 961 (9th Cir. 2005), to argue that the in-chambers hearing was a

critical stage in the proceedings. None of these cases supports Rooks' position. The court in *Campbell* declined to determine whether an in-chambers conference was a critical stage of the proceedings because it concluded any error in excluding the defendant from the conference was harmless. In *Lopez*, the trial court held an in-chambers hearing regarding whether defense counsel should withdraw so he could testify at trial as a material witness. The appellate court ruled the hearing was a critical stage of the proceedings because defense counsel had to decide whether he would testify on his client's behalf, and if the defendant had been present, he would have had an opportunity to question the sufficiency of the inquiry or object to defense counsel's representation of his interests. Unlike *Lopez*, here the in-chambers hearing addressed only whether defense counsel had a conflict of interest requiring withdrawal as a matter of law. Furthermore, unlike *Lopez*, because Rooks' defense counsel withdrew and new counsel was appointed, Rooks' right to representation free from conflicts was not violated.

¶33 Finally, in *Bradley*, the defendant was excluded from an in camera conference where retained counsel was allowed to withdraw and new counsel was appointed, because the retained defense counsels' fees were not being paid. The court in *Bradley* concluded the in camera conference was a critical stage of the proceedings because the defendant could have addressed preferences regarding choice of counsel if she had been present. Here, unlike *Bradley*, Rooks' opinion regarding his defense counsel's conflict of interest was not relevant to determining whether there was a conflict of interest as a matter of law and the in-chambers hearing was not a critical stage of the proceedings at which Rooks had a right to be present.

## Corpus Delicti

¶34 Rooks contends the trial court erred in admitting his taped confession under the corpus delicti rule. Rooks claims the corpus delicti was not established because independent

evidence supported reasonable and logical inferences of both a criminal and a noncriminal cause of Amanda's death. The medical examiner testified he was unable to determine the cause of Amanda's death. The examiner found evidence that Amanda ingested cocaine within a few days of her death and was unable to exclude either strangulation or cocaine overdose as the cause of death.

¶35 Under the corpus delicti rule, a defendant's confession or admissions are not admissible unless independent corroborating evidence establishes the corpus delicti of the crime. *State v. Aten*, 130 Wn.2d 640, 656, 927 P.2d 210 (1996).[9] The purpose of the corpus delicti rule is to protect a defendant from an unjust conviction based on a false confession alone; it prevents the possibility that a false confession was obtained through police coercion or abuse and the possibility that a confession, though voluntary, is false. *City of Bremerton v. Corbett*, 106 Wn.2d 569, 576-77, 723 P.2d 1135 (1986).

¶36 In a homicide case, the corpus delicti rule requires the State to present evidence independent of the defendant's confession to prove (1) the fact of death and (2) a causal connection between the death and a criminal act. *Aten*, 130 Wn.2d at 655. The State's independent evidence may be either direct or circumstantial. The evidence need not establish the necessary elements of the corpus delicti beyond a reasonable doubt or even by a preponderance of the evidence; it is sufficient if the evidence prima facie establishes the corpus delicti. *Aten*, 130 Wn.2d at 656. "Prima facie" in this context of the corpus delicti rule means " 'evidence of sufficient circumstances which would support a logical and reasonable inference' of the facts sought to be proved." *Aten*, 130 Wn.2d at 656 (quoting *State v. Vangerpen*, 125 Wn.2d 782, 796, 888 P.2d 1177 (1995)).

¶37 In assessing the sufficiency of the State's corpus delicti evidence, a reviewing court must assume the truth of the State's evidence and view all reasonable infer-

[9] "Corpus delicti" literally means "body of the crime." *Aten*, 130 Wn.2d at 655.

ences in the light most favorable to the State. *Aten*, 130 Wn.2d at 658. The causal connection between the death and the defendant's acts cannot be based on mere conjecture and speculation. *Aten*, 130 Wn.2d at 661 (citing *State v. Little*, 57 Wn.2d 516, 521, 358 P.2d 120 (1961)).

¶38 Relying on *Aten*, Rooks argues that because the evidence supports reasonable and logical inferences of both criminal and noncriminal causes of Amanda's death, the corpus delicti was not established. Rooks cites the statement in *Aten* that, " '[t]he final test is whether the facts found and the reasonable inferences from them have proved the nonexistence of any reasonable hypothesis of innocence.' " *Aten*, 130 Wn.2d at 660 (alteration in original) (quoting *State v. Lung*, 70 Wn.2d 365, 372, 423 P.2d 72 (1967)).

¶39 In *Aten*, the defendant confessed to killing an infant by manually suffocating the baby. The independent evidence established the infant died of acute respiratory failure, but the medical examiner testified he could not determine whether the respiratory failure was caused by Sudden Infant Death Syndrome (SIDS) or suffocation. At trial, the medical examiner testified that he concluded the infant died from SIDS and described the similarity in the infant's death to a typical SIDS case. The court held that the corpus delicti is not established where the independent evidence supports reasonable and logical inference of both criminal agency and noncriminal cause and under the facts presented in that case there was insufficient evidence to establish the corpus delicti. *Aten*, 130 Wn.2d at 660. "The totality of independent evidence in this case does not lead to the conclusion there is a 'reasonable and logical' inference that the infant . . . died as a result of criminal negligence and that that inference is not the result of 'mere conjecture and speculation.' " *Aten*, 130 Wn.2d at 661.

¶40 Rooks assumes the court in *Aten* concluded the corpus delicti was not established because there was more than one logical and reasonable explanation for the death. But *Aten* clearly states there was no reasonable inference of

criminal conduct in that case. *Aten,* 130 Wn.2d at 661. Because the court concluded there was no reasonable and logical inference that the infant died as a result of criminal negligence, *Aten* does not hold that the corpus delicti cannot be established where there are reasonable and logical inferences of both criminal and noncriminal causes of death. The court's opinion in *Aten* also suggests that where there is more than one reasonable and logical inference as to the cause of death, if one inference is more consistent with the independent evidence than another, it might make the other inference less likely or reasonable.

¶41 Here, unlike *Aten,* the totality of the independent corroborating evidence leads to the conclusion that there is a causal connection between Amanda's death and a criminal act. Although there was evidence Amanda used cocaine within a few days of her death and Rooks' brother testified Amanda had a history of using crack cocaine and would "hold a hit," the State presented overwhelming independent evidence establishing Amanda's death was the result of a criminal act.

¶42 Rooks had a long history of domestic violence and abusing Amanda, both verbally and physically. Amanda's family and friends witnessed verbal and physical abuse and Rooks' controlling behavior. At the time of her sudden disappearance on July 11, Amanda and Rooks were involved in a custody dispute regarding M.R. Rooks had absconded with M.R. from Alaska. When Rooks returned to Seattle with M.R., he reported to CPS that Amanda was an unfit mother. Amanda moved back to Seattle to regain custody of her son. Amanda told friends and family she was looking forward to M.R.'s birthday on July 18 and wanted to be as involved with him as she could. The guardian ad litem, who was appointed in the custody dispute, testified that Rooks wanted sole custody of M.R. because he wanted control of the parenting role and all decisions about his son. The guardian ad litem also testified that Rooks appeared to be obsessed with Amanda and expressed a desire to get back together with her.

¶43 The day Amanda disappeared she was awake and saw her father before he left for work early that morning. Steve left his cell phone with Amanda so she could call Rooks' mother, Diane Schomburg, to confirm the picnic she had planned with M.R. for that day. Amanda called Diane Schomburg at 9:38 A.M. to confirm getting together for the picnic later that day. Around 11:00 that morning, a mail carrier attempted to deliver a package to the apartment. He heard noises from inside the apartment, but no one answered the door. Amanda did not show up for the picnic with M.R. that afternoon. The guardian ad litem testified that it was extraordinarily unusual for Amanda to not show up for her visit with M.R. because she had never missed a visit.

¶44 When Steve Gurr arrived home on the evening of July 11, Amanda was not there. The front door was unlocked, which was unusual. The stereo was still on, and it was turned up much louder than usual. Although Amanda typically left Steve a note if she went out, there was no note. Steve found her keys, purse, and cigarettes behind her dresser, though she never left without them. There were no clothes missing and no drugs or drug paraphernalia in the apartment. Although Steve's cell phone was never found, it was not used after Amanda called Diane Schomburg on the morning of July 11.[10]

¶45 In September, Amanda's body was found in a remote location, 75 yards from a public road in a heavily vegetated area next to a creek that was 20 feet from the service road. Amanda was partially clothed in jeans and a shirt was nearby, but she was not wearing any shoes. The medical examiner testified Amanda's body had been at that location for one to three months.

---

[10] This evidence is analogous to that presented in *State v. Thompson*, 73 Wn. App. 654, 870 P.2d 1022 (1994), where this court concluded the corpus delicti was established even though the victim's body was never found. *See Thompson*, 73 Wn. App. at 663 (relying on the victim's habits regarding housework, patterns of contact with her friends, and care of her pets, as well as evidence that she disappeared suddenly and without warning, as creating a strong inference that she died and her death was sudden and caused by criminal means).

¶46 The inference that Amanda died from an overdose is supported by scant evidence and speculation. By contrast, the totality of the State's independent evidence leads to the unquestionable conclusion that there is a reasonable and logical inference that Amanda's death was the result of a criminal act. We conclude the corpus delicti was established and Rooks' confession and admissions were properly admitted.

¶47 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

GROSSE, J., concurs.[11]

Review denied at 158 Wn.2d 1007 (2006).

---

[11] Judge Faye C. Kennedy had indicated her concurrence prior to her death on September 16, 2005. *Gibson v. City of Auburn*, 50 Wn. App. 661, 671, 748 P.2d 673 (1988); *State v. Carey*, 42 Wn. App. 840, 857, 714 P.2d 708 (1986); *Honcoop v. State*, 43 Wn. App. 300, 317, 716 P.2d 963 (1986).